Kathryn L. LAWLEY and Colorado State Personnel Board, Petitioners,

v.

DEPARTMENT OF HIGHER EDUCATION and Board of Trustees of the University of Northern Colorado, University of Northern Colorado, Respondents.

No. 00SC473.

Supreme Court of Colorado, En Banc.

Dec. 3, 2001.

Nora V. Kelly, P.C., Denver, CO, Attorney for Petitioner Kathryn L. Lawley.

Ken Salazar, Attorney General, Denise De-Forest, Assistant Attorney General, Business and Licensing, Denver, CO, Attorneys for Petitioner Colorado State Personnel Board.

Ken Salazar, Attorney General, Susan J. Trout, Assistant Attorney General, Regulatory Law Employment Section, Denver, CO, Attorneys for Respondents.

Justice RICE delivered the Opinion of the Court.

We granted certiorari to review an unpublished opinion of the Colorado Court of Appeals that reversed a decision of the Colorado State Personnel Board (Board) directing that Kathryn Lawley be reinstated as the Director of Parking Services of the Universi-

ty of Northern Colorado (University). The Personnel Board's decision adopted the findings of fact made by an Administrative Law Judge (ALJ) in an evidentiary hearing resulting from Lawley's appeal to the Personnel Board [1]; however, it rejected the ALJ's conclusions of law.[2] The ALJ concluded: (1) that the action abolishing Lawley's position was not arbitrary, capricious, or contrary to rule or law; and (2) that the University did not discriminate on the basis of gender. The Board reversed the ALJ's conclusions of law and ruled that the University's action in abolishing Lawley's position was arbitrary and capricious and constituted gender discrimination.

■ We must first resolve whether the Board was bound by the ALJ's ultimate conclusion that the University's actions were not arbitrary, capricious, or contrary to rule or law and its conclusion that the University did not discriminate against Lawley. Next, we must decide whether the court of appeals erred when, considering the Board's decision, it concluded, "Reasonable persons fairly and honestly considering the findings and evidence must reach a contrary conclusion." *Lawley v. Dep't of Higher Educ.*, No. 98CA1912, slip op. at 11 (Colo.App. Apr. 6, 2000). We find that both of the Board's conclusions—that the University discriminated against Lawley and that its action was arbitrary and capricious—are ultimate conclusions of fact. Therefore, the Board was entitled to substitute its own judgment for the ALJ's decision regarding both conclusions. In light of our recent decision in *Bodaghi v. Department of Natural Resources*, 995 P.2d 288 (Colo.2000), we also conclude that the court of appeals erred when it ruled, after considering only a portion of the evidence from the record, that "[t]hese facts, without more ... do not support a conclusion that the action was a pretext for discrimination." *Lawley*, No.

1. On appeal, the matter was first referred to the Colorado Civil Rights Division which issued a finding of no probable cause. Lawley then requested a hearing before the Board.

2. Both the ALJ and the Board referred to the ALJ's conclusions as "conclusions of law." However, we note that section 24-4-105(15)(b),

7 C.R.S. (2001) distinguishes between "evidentiary facts" and "ultimate conclusions of fact," and the later encompasses both "conclusions of law" and "mixed question[s] of law and fact." *See State Bd. of Med. Exam'rs v. McCroskey*, 880 P.2d 1188, 1193 (Colo.1994).

98CA1912, slip op. at 10. We hold that the record contains sufficient evidence to support the Personnel Board's ultimate conclusion of fact that the University was motivated by gender when it abolished Lawley's position. We also hold that the Board's ruling that the University acted arbitrarily and capriciously is warranted by the record. Accordingly, we reverse the court of appeals and reinstate the order of the Board.

## FACTS

Lawley served as Director of Parking Services at the University of Northern Colorado from June 1988 until June 1997, when the position was abolished.[3] At the time the University abolished the position, Lawley's salary was $67,680. Although administratively located within the University's Police Department, the parking services unit is self-funded through sources of revenue such as the sale of decals, meter fees, and parking space fees. During Lawley's tenure, Parking Services generated about $750,000 of revenue and operated with a budget surplus. Lawley's salary was paid out of an auxiliary fund generated from parking revenues.

In fiscal year 1996–97, the University experienced a decline in enrollment for the third consecutive academic year. Because of the TABOR (The Taxpayer's Bill of Rights) amendment,[4] which was passed in 1992, the drop in student enrollment affected the amount of funding the University received from the state legislature. The University's president concluded that the University would be required to reduce spending authority for $159,607 in salaries in order to balance the budget for 1997–98. The University determined that the following objectives should be taken into account in implementing any cost-saving plan: (1) existing employees should be retained; (2) employee salaries should remain commensurate with what they were prior to the restructuring; and (3) essential services of the University should not be affected.

The Division of Finance · and Administration (Division), which includes the parking unit, was asked to reduce statefunded salaries by $40,000. In order to meet the required cost reductions, the University abolished the Parking Director position, reassigned Lawley's duties to the Police Chief, and created a new position to assist the Police Chief with administering parking operations.[5] Assigning parking services duties to the Chief of Campus Police allowed the University to pay approximately $40,000 of the Chief's salary out of parking revenues, rather than entirely from state-appropriated funds as before. The new position was classified as an Administrative Program Specialist with a salary of $39,600 and was filled by Mike Rose, whose previous position with a comparable salary had been eliminated. The elimination of Rose's previous post had put Rose in a position where he could, under University rules, take the job of another University employee, Darrell Johnson. Therefore, by creating a new position for Rose the University prevented Johnson from being forced out of his job. Chief of Campus Police Terence Urista testified that Assistant to the Vice–President of Administration Robert Hetzel told him that preventing Johnson from being bumped out of his job was one of the reasons that the new position had been created.

In making its decision, Hetzel, who participated in developing the budget for the Division of Finance and Administration and the Division of Auxiliary Services, testified that one of the factors management considered was the previous history of internal redistributions within the Division. Police services

---

3. We do not rely solely on the findings of fact made by the ALJ, but rather review the record to determine whether substantial evidence exists on the record to support the conclusions of the agency. Cf. *Lassner v. Civil Serv. Comm'n*, 177 Colo. 257, 259, 493 P.2d 1087, 1088–89 (1972) (construing predecessor statute delineating the extent of appellate court's power in reviewing evidence presented at an administrative hearing).

4. Colo. Const. art. X, § 20.

5. ⁴Because a hiring freeze was in place at the University, the Division recommended to the University's Hiring Freeze Committee that a new position be approved to provide the Police Department and Parking Services with administrative support.

had not been affected by redistributions in the prior three years. In addition, the Division found that Lawley's salary exceeded that of individuals in comparable positions at similar institutions. It also found that the University paid Lawley the same salary as the Parking Services Director at Colorado State University, an institution with an enrollment twice that of the University. However, the Division did not conduct a formal salary survey. Moreover, Hetzel did not include the informal salary information in a memorandum, which explained the restructuring, to Dennis Hayzlett, the Director of Personnel Services, even though Hetzel testified that the salary comparison was a crucial part of his analysis. Testimony from the Dean of Students, Jean Schober Morrell, and Chief Urista indicates that Hetzel expressed repeated concern about Lawley's salary. Furthermore, the University had conducted a job audit on Lawley's position in 1995 to review her level of responsibility and job functions and set her salary accordingly. No formal job audit was conducted pursuant to the plan to abolish her position.

Two days prior to the effective date of the restructuring, Chief Urista,[6] who had not been consulted about abolishing Lawley's position, offered an alternative restructuring proposal. Chief Urista proposed that most of the budgetary savings could be made without abolishing Lawley's position. The University did not change its plans after receiving the Police Chief's alternative proposal.

Moreover, Chief Urista testified that a memo regarding the abolition of the Director of Parking Services position sent from Hetzel to Vice President of Administration Steven Garcia misrepresented his position. The memo stated, and Hetzel testified, that Chief Urista recommended that the University create a new Police Officer III position in response to the "reorganization of Parking Services." Chief Urista testified that he recommended an Administrator I level position.

As a result of the University's actions, Lawley exercised her retention rights under the State Personnel Board rules and was moved into a position as a Police Officer III in the University Police Department. This was a demotion for Lawley as the new position was classified at a lower pay grade. Lawley filed a grievance and in response was promoted to Lieutenant with a salary of $60,060 and a less desirable swing shift schedule than her work schedule as Director.

Lawley appealed the University's actions to the Board, alleging unlawful discrimination and arbitrary and capricious action. The ALJ issued an initial decision, denying relief on both grounds and concluding that the University did not discriminate against Lawley and did not act arbitrarily, capriciously, or contrary to law. The Board reviewed the ALJ's initial decision and reversed it, finding both discrimination by the University and arbitrary and capricious action. On appeal, the court of appeals reversed the Board's decision, reasoning that "[r]easonable persons fairly and honestly considering the findings and evidence must reach a contrary conclusion." *Lawley*, No. 98CA1912, slip op. at 11.

## ANALYSIS

This case presents a fairly narrow issue.[7] First, we must determine whether the Board was entitled to substitute its own conclusions for those of the ALJ. Next, we must analyze whether the court of appeals erred when it decided that the Board abused its discretion in concluding: (1) that the University discriminated against Lawley based on her gender; and (2) that the University's decision to abolish Lawley's position was arbitrary and capricious. We first provide a brief introduction to the state personnel system in order to better analyze the relationship between the Board and its ALJ and to set out the appropriate standard of review for the Board's review of the ALJ's decision.

---

6. Urista was Lawley's supervisor when she served as the Director of Parking Services.

7. We granted certiorari on the following issue: Whether the court of appeals decided a question of substance in a way not in accord with applicable decisions of the Supreme Court, and acted as a factfinder, when it reversed the Board's ultimate findings of fact of discrimination and arbitrary and capricious action.

## A. Introduction to the State Personnel System

The state personnel system is established by Article XII, sections 13, 14, and 15 of the Colorado Constitution and is legislatively defined by sections 24–50–101 to –615, 7 C.R.S. (2001). The State Personnel Board is a constitutionally created state agency with five members. Colo. Const. art. XII § 14.

The Board may employ administrative law judges, as well as other support personnel, to carry out its duties under state law. § 24–50–103(7), 7 C.R.S. (2001). The authority of an administrative law judge is fundamentally grounded in the Board's authority. Section 24–50–139 provides: "The board may authorize administrative law judges to conduct hearings on any matter within the jurisdiction of the board upon such conditions and terms as the board may determine and subject to the provisions of section 24–50–103(7) and article 4 of this title." § 24–50–139, 7 C.R.S. (2001). Moreover, section 24–50–125.4(4) establishes that in cases where "an administrative law judge conducts a hearing on behalf of the board," a party who seeks to "modify the initial decision" must file an appeal with the board. § 24–50–125.4(4), 7 C.R.S. (2001).

As a state agency with statewide territorial jurisdiction,[8] the Board's actions are governed by the State Administrative Procedure Act, sections 24–4–101 to –108, 7 C.R.S. (2001). Thus, the Personnel Board must review the decision under standards set forth in section 24–4–105(15)(b), 7 C.R.S. (2001). Section 24–4–105(15)(b) of the Act sets forth the appropriate scope of review to be employed by the Board when reviewing an ALJ's decision:

> The findings of evidentiary fact, as distinguished from ultimate conclusions of fact, made by the administrative law judge or the hearing officer shall not be set aside by the agency on review of the initial decision

unless such findings of evidentiary fact are contrary to the weight of the evidence. § 24–4–105(15)(b), 7 C.R.S. (2001).

■ Section 24–4–105(15)(b) clearly states, and we have previously ruled, that the Personnel Board's authority to review and set aside an ALJ's finding depends on whether the finding is one of "evidentiary" or "ultimate" fact. *State Bd. of Med. Exam'rs v. McCroskey*, 880 P.2d 1188, 1193 (Colo. 1994). On review, the Board may not set aside an evidentiary fact made by an ALJ unless it is contrary to the weight of the evidence. § 24–4–105(15)(b); *McCroskey*, 880 P.2d at 1193. However, the Board can substitute its own judgment for the ALJ's decision with respect to an ultimate conclusion of fact as long as the Board's finding has a reasonable basis in law. *Lee v. State Bd. of Dental Exam'rs*, 654 P.2d 839, 844 (Colo. 1982).

Although the distinction between evidentiary facts and ultimate conclusions of fact is not always clear, evidentiary facts generally include the detailed factual or historical findings on which a legal determination rests. *McCroskey*, 880 P.2d at 1193. Ultimate conclusions of fact, on the other hand, involve conclusions of law, or at least mixed questions of law and fact, and often settle the rights and liabilities of the parties. *Id.*

## B. The Personnel Board Was Not Bound by the ALJ's Ultimate Conclusions of Fact

■ As we set out above, section 24–4–105(15)(b), not 24–4–106(7), sets forth the appropriate scope of review to be employed by the Board when reviewing an ALJ's decision. Thus, the University's argument, on appeal to this court, that section 24–4–106(7) applies to the Board's review of the ALJ's decision mistakes the standard of review for judicial review of Board action for the stan-

---

8. Section 24–4–107 provides that the State Administrative Procedure Act applies to every agency of the state having statewide territorial jurisdiction, unless the act conflicts with a "specific statutory provision relating to a specific agency." § 24–4–107, 7 C.R.S. (2001). In this case, section 24–50–125.4(3), in the article outlining the state personnel system, states, "Any party may

appeal the decision of the board to the court of appeals within forty-five days in accordance with section 24–4–106(11)." § 24–50–125.4(3), 7 C.R.S. (2001). Thus, the article delineating the responsibilities and parameters of the state personnel system specifically refers to the State Administrative Procedure Act.

dard to be applied when the Board reconsiders an ALJ's initial decision.[9] Moreover, the University misconstrues the distinction between evidentiary facts and ultimate conclusions of fact in arguing that "the Board's reversal of the ALJ is clearly an improper usurpation of the ALJ's decision on credibility, something a reviewing tribunal cannot do."

A determination of whether a plaintiff has met the burden of proof in a discrimination case requires an analysis of the historical facts of the case in light of the applicable discrimination law in order to make an ultimate conclusion. The determination of whether the complainant has met the burden of proof controls the outcome of the discrimination claim and settles the rights and liabilities of the parties.

Moreover, the United States Supreme Court, in delineating the analytical framework for discrimination claims, specifically refers to a finding of intentional discrimination as a question of ultimate fact. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) ("The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination.").

Here, in making its determination, the Board considered several historical facts, including the following: (1) that Hetzel failed to confer with either Chief Urista or Lawley in formulating his proposal to abolish Lawley's position; (2) that a question existed as to whether Hetzel accurately communicated Chief Urista's alternative suggestion to the Vice President; (3) that the University failed to consider Chief Urista's counter-proposal, which the Chief believed would accomplish the necessary savings without eliminating Lawley's position; (4) that Hetzel singled out Lawley because he believed she made too much money; and (5) that Lawley was never asked to reduce her salary. These evidentiary facts are the detailed historical findings on which the Board's ultimate conclusion of fact that the University "targeted [Lawley's] job in order the save the job of another, male, employee," (R. at v. III, p. 410), rests. Therefore, the Board was entitled to substitute its own judgment for the ALJ's decision with regard to the ultimate conclusion of fact that the University discriminated against Lawley.[10]

The Board's conclusion that the University's action was arbitrary and capricious is also an ultimate conclusion of fact. Like the finding of discrimination, this too fixes the "rights and liabilities of the parties." The

9. Section 24–4–106(7) provides:
   If the court finds no error, it shall affirm the agency action. If it finds that the agency action is arbitrary or capricious, a denial of statutory right, contrary to constitutional right, power, privilege, or immunity, in excess of statutory jurisdiction, authority, purposes, or limitations, not in accord with the procedures or procedural limitations of this article or otherwise required by law, an abuse or clearly unwarranted exercise of discretion, based upon findings of fact that are clearly erroneous on the whole record, unsupported by substantial evidence when the record is considered as a whole, or otherwise contrary to law, then the court shall hold unlawful and set aside the agency action and shall restrain the enforcement of the order or rule under review, compel any agency action to be taken which has been unlawfully withheld or unduly delayed, remand the case for further proceedings, and afford such other relief as may be appropriate. In making the foregoing determinations, the court shall review the whole record or such portions thereof as may be cited by any party. In all cases under review, the court shall determine all questions of law and interpret the statutory and constitutional provisions involved and shall apply such interpretation to the facts duly found or established.
   § 24–4–106(7), 7 C.R.S. (2001).

10. If the discretion to determine whether an employer discriminated against an employee or applicant is removed from the Board, employees and applicants will be subject to varying decisions by different ALJs. This will result in decisions that are not uniform, even though the facts may be similar. *Cf. McCroskey*, 880 P.2d at 1196 (ruling that removing the discretion to determine the generally accepted standard of medical practice from the Board would result in different interpretations by individual ALJs, resulting in physician liability for discipline becoming wholly dependent upon the ALJ to whom the case is assigned).

Board based its conclusion on detailed evidentiary factual findings, including the fact that the University did not confer with the Chief of Campus Police in making its decision; that a question existed as to whether the Assistant to the Vice President of Administration accurately communicated the Police Chief's idea to the Vice President; and that the University failed to consider the Police Chief's alternative proposal. These historical facts support the Board's ultimate conclusion of fact that the University acted arbitrarily and capriciously in abolishing Lawley's position. Thus, we conclude that the Board was not bound by the ALJ's determination that the University's action was not arbitrary or capricious.

### C. Standard of Review for Judicial Review of the Board's Decision

■ A reviewing court may reverse the decision of an administrative agency if the court finds that the agency acted arbitrarily or capriciously, made a decision that is unsupported by the record, erroneously interpreted the law, or exceeded its authority. § 24–4–106(7), 7 C.R.S. (2001)[11]; *McClellan v. Meyer*, 900 P.2d 24, 29 (Colo.1995). Thus, we must next consider whether the court of appeals erred when it ruled, considering only a portion of the evidence from the record, that "[t]hese facts, without more, do not give rise to an inference that the decisions were arbitrary or capricious, nor do they support a conclusion that the action was a pretext for discrimination." *Lawley*, No. 98CA1912, slip op. at 10.

### 1. Lawley's Discrimination Claim

■ The court of appeals, in light of our recent decision in *Bodaghi v. Department of Natural Resources*, 995 P.2d 288 (Colo.2000), erred as a matter of law by considering only a portion of the evidence from the record without analyzing whether, when the record is considered as a whole, substantial evidence supports the Personnel Board's conclusion that, "Respondent targeted Complainant's job in order to save the job of another, male, employee." (R. at v. III, p. 410.) Our analysis is guided by the analytical framework we approved of in *Colorado Civil Rights Commission v. Big O Tires*, 940 P.2d 397 (Colo. 1997) and clarified in *Bodaghi*, which governs discrimination law in Colorado.

#### a. Colorado Employment Discrimination Law

This court has adopted the United States Supreme Court's analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) for analyzing claims of employment discrimination. *Big O Tires*, 940 P.2d at 400. However, we have modified the language of the *McDonnell Douglas* analytical framework in order to "accommodate various kinds of employment decisions and various forms of discrimination."[12] *Id.*

■ In order to prove intentional discrimination under section 24–34–402, 7 C.R.S. (2001) a plaintiff must establish, by a preponderance of the evidence, a prima facie case of discrimination. § 24–34–402, 7 C.R.S. (2001). The factors of a prima facie case of intentional discrimination are: (1) that the complainant belongs to a protected class; (2) that the complainant was qualified for the position; (3) that the complainant suffered an adverse employment decision despite his qualifications; and (4) that the circumstances gave rise to an inference of unlawful discrimination. *Big O Tires*, 940 P.2d at 400 (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).

■ Under the *McDonnell Douglas* framework we adopted, once the plaintiff establishes a prima facie case of intentional discrimination, he has created a presumption that the employer unlawfully discriminated

---

11. The court of appeals reviewed the Board's decision pursuant to section 24–4–106(11), 7 C.R.S. (2001), as provided in section 24–50–125.4(3), 7 C.R.S. (2001). Section 24–4–106(11) states that appeals brought under this section will be reviewed according to section 24–4–106(7), 7 C.R.S. (2001).

12. As we noted in *Big O Tires*, the language of the *McDonnell Douglas* framework is specifically tailored to an employer's failure to hire a complainant based on racial discrimination. *Big O Tires*, 940 P.2d at 400 n. 2.

against the complainant. *Bodaghi*, 995 P.2d at 297. If the employer does not rebut the presumption, the factfinder is required to rule in favor of the complainant. *Id.* (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)).

■ Although the burden of proof remains on the complainant, the employer has the burden of producing an explanation to rebut the prima facie case: the employer must provide a non-discriminatory explanation for its action. *Bodaghi*, 995 P.2d at 297 (citing *St. Mary's Honor Ctr.*, 509 U.S. at 507, 113 S.Ct. 2742). However, if the employer articulates a legitimate, non-discriminatory reason for the adverse decision and provides evidence to support its legitimate purpose, the presumption created by the prima facie case is rebutted and drops from the case. *St. Mary's Honor Ctr.*, 509 U.S. at 507, 113 S.Ct. 2742. Thus, if the employer offers sufficient evidence to sustain the proffered legitimate purpose, the employee cannot prevail solely on the prima facie case. *Bodaghi*, 995 P.2d at 298.

■ If the employer meets its burden of producing a legitimate reason for the action, the complainant must be given " 'a full and fair opportunity to demonstrate by competent evidence that the presumptively valid reasons for the adverse employment decision were in fact a pretext for discrimination.' " *Id.* (quoting *Big O Tires*, 940 P.2d at 401). Importantly, the complainant can satisfy this burden of proof by evidence already in the record. Colorado law does not require, in every case, that the complainant offer additional evidence to support an inference of intentional discrimination. *Bodaghi*, 995 P.2d at 298.

■ Again, if the employer produces evidence of a legitimate reason for its action, the factfinder "giving full and fair consideration to the evidence offered by both sides, proceeds to decide the ultimate question: whether, in light of all the evidence in the record, the employee has proved that the employer intentionally and unlawfully discriminated against the employee." *Bodaghi*, 995 P.2d at 298 (citing *Burdine*, 450 U.S. at 253, 101 S.Ct. 1089). We emphasize, however, that in determining whether the employer discriminated against the employee, " 'the factfinder's disbelief of the reasons put forth by the [employer] (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination.' " *Bodaghi*, 995 P.2d at 299 (quoting *St. Mary's Honor Ctr.* 509 U.S. at 511, 113 S.Ct. 2742); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (holding that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated"). Thus, "the factfinder's rejection of the employer's proferred reasons will 'permit the trier of fact to infer the ultimate fact of intentional discrimination,' " *Bodaghi*, 995 P.2d at 299 (quoting *St. Mary's Honor Ctr.* 509 U.S. at 511, 113 S.Ct. 2742), from evidence already in the record. *Bodaghi*, 995 P.2d at 299.

### b. The Board's Finding of Intentional Discrimination is Supported by the Record

■ In this case, Lawley established a prima facie case of gender discrimination. Specifically, Lawley established the elements of a prima facie case as follows: (1) that, as a woman, she is a member of a protected class; (2) that she was qualified for the position; (3) that her position was abolished (she suffered an adverse employment action) despite her qualifications; and (4) that the evidence in the record supports an inference of gender discrimination because an altered position in the parking unit was ultimately filled by Mike Rose, a person in an unprotected class.

■ In response, the University articulated a legitimate, non-discriminatory reason for abolishing the Director of Parking Services position. The University argued that due to a drop in funding from the state legislature it was required to cut state-side salaries by $40,000 in the Division of Finance and Administration. Because other units in the Division had been subjected to layoffs in the prior three years, management concluded that the police unit was best situated to

absorb this reduction. Management also concluded that the Director position was too highly compensated compared to the same position at similar schools, and, therefore, it decided to abolish the Director position, reallocate about half of the police chief's salary to the parking unit, and save the required $40,000 in state-side salaries.

██ In response, Lawley presented evidence that the University's non-discriminatory reason for abolishing her position was a pretext for a discriminatory reason. Lawley's evidence showed that the University eliminated the Director of Parking Services position, held by Lawley, a highly paid female, in order to create a new position, specifically tailored for a male employee, Rose, to fill, which ultimately protected another male employee, Johnson, from being bumped out of his job under University rules. The University failed to consult Chief Urista in making its decision and failed to consider his alternative proposal, calling for the University to structure the department so that most of the necessary savings could be made without abolishing Lawley's position. In addition, there is a question as to whether Hetzel accurately communicated Urista's assessment of the situation to the Vice President of Administration. Moreover, Lawley presented evidence that Hetzel showed repeated concern with her salary, and, though the position was allegedly abolished because Lawley was overpaid, the University failed to conduct a desk audit or formal salary survey at the time it made its decision. We conclude that the evidence is sufficient to create an inference that the University's asserted nondiscriminatory reason for abolishing Lawley's position was a pretext for discrimination.

██ The court of appeals' conclusion that the University did not discriminate against Lawley is inconsistent with our opinions in *Big O Tires* and *Bodaghi*. In analyzing whether the Board's conclusion that the University discriminated against Lawley was an abuse of discretion, the court of appeals focused on only a portion of the evidence from the record. Then, rather than determining whether substantial evidence supported the Board's inference of discrimination, it cut its

analysis short, reasoning that the University's nondiscriminatory justification for its action was dispositive of the issue. However, as we made clear in *Bodaghi*, once an employer proffers a legitimate reason for its action, the factfinder may still infer, from all the evidence in the record, that the employer's nondiscriminatory reason was in fact a pretext for discrimination.

Specifically, the court of appeals relied on the following evidence from the record: (1) it considered the fact that management concluded Lawley was overpaid; (2) it analyzed Hetzel's concern that the University retain the services of a male employee whose position had been eliminated in the restructuring; and (3) it considered the fact that the University did not take into account the written counterproposal of the chief of police. *Lawley*, No. 98CA1912, slip op. at 9–10. We will discuss each in turn.

In analyzing Hetzel's conclusion that Lawley was overpaid, the court of appeals reasoned, "[T]here is *no* evidence in this record that [Hetzel] reached that conclusion because Lawley was a woman.... [A] determination as to whether a position, or which positions, may be overpaid is a rational consideration and starting point in formulating the restructuring." *Id.* at 10 (emphasis added). In so holding, it appears that the court of appeals was looking for a "smoking gun" in the nature of direct evidence of discrimination.

However, we have ruled, "[D]irect evidence of discrimination is rare.... There should be nothing novel about establishing [intentional discrimination] through the use of circumstantial evidence, for ... circumstantial evidence is not less probative than direct evidence, and in some cases is even more reliable." *Bodaghi*, 995 P.2d at 296. Thus, the court's conclusion that "there is no evidence in this record that [Hetzel] reached that conclusion because Lawley is a woman," *Lawley*, No 98CA1912, slip op. at 10, is error in that it disregards several relevant facts that support the Board's inference of intentional discrimination and its conclusion that the University's nondiscriminatory justification for its concern with Lawley's salary was in fact pretextual.

The following facts from the record support the Board's conclusion that "Hetzel singled out Complainant because he believed she made too much money," (R. at v. III, p. 410), which ultimately supports the Board's inference of intentional discrimination. First, the record indicates that the University conducted a desk audit in 1995 to establish the proper salary for Lawley's position. However, in deciding to abolish Lawley's position, the University failed to conduct a formal salary survey or job audit, relying instead on a single employment advertisement for a parking services manager from a comparable university in Washington, an advertisement that Hetzel failed to include in a memorandum to the Director of Personnel Services, explaining management's decision. Hetzel's inaction is inconsistent with his testimony that the salary comparison was a crucial part of his analysis. Moreover, although Hetzel was aware of several schools in the University of Wisconsin system of comparable size to the University, he could not provide a salary range for those institutions.

Second, the record indicates that Hetzel consistently expressed concern with Lawley's salary. Both Morrell, the Dean of Students, and Chief Urista testified that Hetzel made direct comments to them regarding Lawley's salary. Chief Urista testified:

> He asked me if I knew how much money she made, and I said yes, I know how much money she makes. And he says, Well, she makes more money than you, and I said, Yeah, and I don't have a problem than [sic] that, her job is tougher than mine. Everybody who comes to her is mad or torqued off about parking. That's one of the most thankless jobs there is because everybody's mad at you. And I said, I don't have any problem with her

making more money than I do. And he said, Well, I have problems with that.

(R. at v. II, p. 292.) Although the court of appeals concluded that management's decision that Lawley was overpaid was part of a legitimate analysis, the Board, with its expertise on how salaries are properly set and adjusted under the personnel system, was not so persuaded. These facts support the Board's inference of unlawful discrimination.

Next, in considering the fact that Hetzel was concerned with retaining the services of a male employee, the court of appeals concludes, "This is consistent with the announced goals of the restructuring, one of which was that everyone would remain employed, and in addition, it was consistent with the Assistant Vice President's conclusion that the position held by Lawley was overpaid." *Lawley*, No 98CA1912, slip op. at 10. Again the court accepts the University's nondiscriminatory reason for its action as determinative. It fails to consider whether substantial evidence in the record supports the Board's contrary conclusion that the University's concern with retaining a male employee supports an inference that the University intentionally discriminated against Lawley because of her gender.[13] Our review of the record shows that it supports the Board's contrary inference that "[the University] targeted Complainant's job in order to save the job of another, male, employee." (R. at v. III, p. 410.) For example, Chief Urista testified:

> [A]t the initial time that ... Bob Hetzel gave me the memo saying that this was going to take place, ... I figured there had to be more here than what met the eye.... I was playing a little bit of police officer, trying to do the question-and-answer thing as to you know, what else is happening here that I don't know about or you're not telling me about. And pretty

---

**13.** We note that it is easy to confuse the standard of review for appellate review of an administrative decision with the standard originally applied by the Board to ascertain whether an employer has practiced unlawful discrimination. In *Big O Tires*, we rejected earlier court of appeals decisions that reasoned that "racial discrimination may not be inferred as a basis for the discharge unless such discrimination is supported by substantial evidence." *Big O Tires*, 940 P.2d at 399.

We reasoned that this standard failed to address whether intentional discrimination could be inferred when the employer's reason for the decision is found to be pretextual. *Id.* Thus, we adopted the analytical approach outlined above. Therefore, the question on appellate review is whether substantial evidence in the record supports the Board's inference that the University's proffered nondiscriminatory justification was pretextual.

soon he said, "Well, this does solve another problem for us." And I says, "What's the other problem?" He says, "Well, we have a situation where Mike Rose is being—his position's [sic] being eliminated, and if we have this position, then that would solve a problem because then Darrell Johnson wouldn't get bumped and then Darrell wouldn't have to bump someone else. And so this solves a problem for us." And I said, "Okay, so now I understand, So what you're going to do is you're going to eliminate Kathy's job so you can create a job for Mike Rose to protect Darrell Johnson." "No, no, no, this is financial." And I says, "Well, it doesn't sound like it to me, it sounds like you've got a deal cooked up here where you're creating a position for a person so they don't bump another person to save someone else's job."

(R. at v. II, p. 291.) Moreover, Mr. Rangel, a former human resources specialist for the University, testified that prior to the incident at issue in this case, Hetzel had asked him to change the job classification for Johnson. It was Rangel's impression that "[Hetzel's] purpose was to shelter Darrell Johnson from getting—from losing his position or keeping others from applying for that position because others would not qualify for that class of work once it was reallocated." (R. at v. II, p. 219–20.) Rangel could not recall Hetzel ever asking him to change a job classification for a woman.

Finally, in considering the fact that the University did not take into account the written counterproposal of the Chief of Police, the court of appeals primarily focuses its discussion on whether this fact supports a finding of arbitrary and capricious action by the University, and not on whether it supports a finding of intentional discrimination. However, the court also summarily concludes that this fact, like the others above, does not support "a conclusion that the action was a pretext for discrimination." *Lawley*, No 98CA1912, slip op. at 10. The Board, however, drew the opposite conclusion, reasoning

that Chief Urista's counterproposal "demonstrates that it was unnecessary to abolish Complainant's position in order to save the funds necessary." (R. at v. III, p. 410.) The court of appeals erred in failing to view this fact as a relevant piece of circumstantial evidence supporting the Board's finding of discrimination.

Not only did the court of appeals err by failing to recognize that the evidence outlined above supports the Board's inference of discrimination, the court also disregarded several other factors that the Board considered important to its analysis. The Board focused on Hetzel's failure to confer with either Chief Urista or Lawley in formulating the proposal and expressed concern with whether Hetzel accurately communicated one of Urista's alternative suggestions to the Vice President of Administration. The court of appeals erred by failing to recognize the additional support these facts provide to the Board's inference of discrimination.

In summary, we hold that the Board's determination that the University discriminated against Lawley is based on substantial evidence in the record. The evidence supports the conclusion that Hetzel protected two male employees, Rose and Johnson, by forcing the lay-off of Lawley, a highly paid female employee, and by creating a new position, specifically tailored for Rose to fill, thereby protecting Johnson from being bumped by Rose in the process. These actions were planned without participation from the division heads and, once the plan was announced, in the face of Chief Urista's alternative proposal, which called on the University to structure the department so that most of the necessary savings could be made without abolishing Lawley's position.

### 2. Arbitrary and Capricious Action by the University

Section 24–50–103(6), 7 C.R.S. (2001) authorizes the Board to overturn the state personnel director or an appointing authority's [14]

---

**14.** The Colorado Constitution defines the term "appointing authority" as follows: "The head of each principal department shall be the appointing authority for the employees of his office and for heads of divisions, within the personnel sys- tem, ranking next below the head of such department. Heads of such divisions shall be the appointing authority for all positions in the personnel system within their respective divisions...." Colo. Const. art. XII, § 13(7).

actions only if it finds those actions to be "arbitrary, capricious, or contrary to rule or law." Thus, we must next determine whether the Board's decision that the University's action was arbitrary and capricious was an abuse of discretion. *Kerr v. Bd. of County Comm'rs*, 170 Colo. 227, 231, 460 P.2d 235, 237 (1969).

In *Van DeVegt v. Board of County Commissioners of Larimer County*, 98 Colo. 161, 55 P.2d 703 (1936), we defined arbitrary and capricious administrative action. We stated:

> Capricious or arbitrary exercise of discretion by an administrative board can arise in only three ways, namely: (a) By neglecting or refusing to use reasonable diligence and care to procure such evidence as it is by law authorized to consider in exercising the discretion vested in it. (b) By failing to give candid and honest consideration of evidence before it on which it is authorized to act in exercising its discretion. (c) By exercising its discretion in such manner after a consideration of evidence before it as clearly to indicate that its action is based on conclusions from the evidence such that reasonable men fairly and honestly considering the evidence must reach contrary conclusions.

*Van DeVegt*, 98 Colo. at 166, 55 P.2d at 705.[15]

[19] Based on our review of the record and the applicable law, we find that there was a reasonable basis in law for the Board's conclusion that the University's decision to abolish Lawley's position was arbitrary and capricious. Therefore, the court of appeals erred in overturning the Board's decision.

In making its determination the Board considered several facts including: (1) that Hetzel failed to confer with either Chief Urista or Lawley in formulating his proposal to abolish Lawley's position; (2) that a question existed as to whether Hetzel accurately communicated Urista's ideas to the Vice President of Administration (Urista was opposed to the changes proffered by Hetzel); and (3) that the University failed to consider Chief Urista's alternative proposal, one which Urista believed would accomplish the necessary savings without eliminating Lawley's position.

Applying *Van DeVegt* to this case, we conclude that the record supports the Board's decision that the University failed to give candid and honest consideration to evidence before it on which it was authorized to act in exercising its discretion. Specifically, the University's decision to abolish Lawley's position was arbitrary and capricious because it failed to give candid consideration to the Chief of Police's alternative proposal, a plan emphasizing that most of the budgetary savings could be made without abolishing Lawley's position.

In reviewing an administrative board's decision, we have emphasized two key principles: (1) that all reasonable doubts as to the correctness of the administrative body's ruling must be resolved in its favor; and (2) that, unless an abuse of discretion is shown, the administrative determination will not be disturbed. *Kerr*, 170 Colo. at 231, 460 P.2d at 237. The State Personnel Board is a constitutionally created state agency with considerable expertise in personnel matters,

---

**15.** As the applicability of *Van DeVegt* to the present case has been called into doubt by *Hughes v. Department of Higher Education*, 934 P.2d 891 (Colo.App.1997), we make clear that the principles we annunciated in *Van DeVegt* continue to apply to administrative actions. In *Hughes*, the court of appeals overturned an ALJ's decision (the Board adopted the ALJ's findings and conclusion) that the University of Colorado at Colorado Springs' act of abolishing an employee's position, which impacted two other employees' jobs, was arbitrary and capricious. The court reasoned that the ALJ's reliance on *Van DeVegt* was misplaced: "The failure to gather, hear, and consider evidence required by statute is materially different from the failure, if failure there be, to gather, hear, and consider evidence, the consid-

eration of which is discretionary." *Hughes*, 934 P.2d at 895. The court further reasoned, "The factors to consider and the weight or priority to be given any particular factor is for the University to determine."

The court reads *Van DeVegt* too narrowly. Part (b) of the *Van DeVegt* test defines arbitrary or capricious action as the failure to "give candid and honest consideration of the evidence before it on which it is authorized to act in exercising its discretion." *Van DeVegt*, 98 Colo. at 166, 55 P.2d at 705. In attempting to explain why *Van DeVegt* is an improper basis for sustaining the ALJ's decision, the *Hughes* court ignores this second prong of the test. Therefore, *Hughes* is overruled to the extent that it is inconsistent with *Van DeVegt* and this opinion.

and its conclusions should be given deference. *Cf. Integrated Network Servs., Inc. v. Pub. Utils. Comm'n,* 875 P.2d 1373, 1377 (Colo.1994) (finding that Public Utilities Commission is an administrative agency with considerable expertise in the area of utility regulation, and, as such, should be accorded due deference). We will not disturb the Board's findings unless it made a decision unsupported by the record, exceeded its authority, or acted arbitrarily or capriciously. The Board, relying on evidence indicating that the University took no account of the Chief's alternative proposal; that the Assistant to the Vice–President for Administration may have inaccurately communicated the Police Chief's ideas; and that the University failed to consult the very division heads whose department would be affected, determined that the University's action was arbitrary and capricious. The record supports this determination and we will not disturb it on our limited review.

## CONCLUSION

Accordingly, we hold that a finding of intentional discrimination and a finding of arbitrary and capricious action are ultimate conclusions of fact. Therefore, the Board was entitled to substitute its own judgment for the ALJ's decision regarding both conclusions. We also hold that the record contains sufficient evidence to support the Personnel Board's finding that the University was motivated by gender when it abolished Lawley's position and that the University's action was arbitrary and capricious. We therefore reverse the court of appeals' holding to the contrary and reinstate the order of the Board.

Justice COATS dissents in part, concurs in part and, Justice KOURLIS joins in the dissent and the concurrence.

Justice COATS, dissenting in part and concurring in part:

I dissent in part because I do not agree that a finding of intentional discrimination is a matter as to which the Personnel Board was entitled to substitute its judgment for that of the Administrative Law Judge who heard the evidence. It is not entirely clear to me whether the majority holds that a finding of intentional discrimination is in the nature of a conclusion of law and is therefore subject to de novo review generally, or merely that it is a type of finding or conclusion as to which an agency may substitute its own judgment for that of a hearing officer. In either case, however, because I consider a finding of intentional discrimination to be a finding of historical fact, as to which the Board is bound unless it is clearly erroneous, I disagree.

Although employment discrimination is designated an unfair employment practice by statute in Colorado, *see* § 24–34–402(1)(a), 7 C.R.S. (2001), we have held that our statute closely parallels its federal counterpart in Title VII of the Civil Rights Act and have expressly adopted the order and allocation of proof required for employment discrimination claims filed pursuant to that Act. *Colo. Civil Rights Comm'n v. Big O Tires, Inc.,* 940 P.2d 397, 400 (Colo.1997) (expressly adopting analysis of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). The ultimate question of intentional discrimination—whether the nondiscriminatory reasons offered by the employer are merely a pretext—is the last step in a three-step analysis, requiring first that the employee establish a prima facie case of discrimination and second, that the employer come forward with nondiscriminatory reasons for its actions. *See Bodaghi v. Dep't of Natural Res.,* 995 P.2d 288, 297–99 (Colo.2000).

While a finding of intentional discrimination is the ultimate determination establishing an unfair employment practice, it is clearly a matter of historical fact and must be treated as such by a reviewing body. *See Anderson v. Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985) (finding of intentional discrimination in Title VII context is finding of fact and shall not be set aside unless clearly erroneous, as required by Fed.R.Civ.P. 52(a)). Rather than involving policy or legal considerations, the question whether an employer has intentionally discriminated is one of subjective intent. An employee must establish by a preponderance of the evidence that the legitimate rea-

sons offered by the employer were not its true reasons but were a pretext for discrimination. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143–49, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). Such a finding will rest primarily on a determination of the credibility of the witnesses. *Id.* In entertaining a motion for judgment as a matter of law, a court may not merely preempt the ultimate factfinder or substitute its own finding of fact. It may not make credibility determinations or weigh the evidence, but must draw all reasonable inferences in favor of the nonmoving party. *Id.* at 150, 120 S.Ct. 2097.

The identical, three-step analysis applies to a challenge of discriminatory use of peremptory challenges in jury selection. *See Batson v. Kentucky*, 476 U.S. 79, 94 n. 18, 98 n. 20, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); *see also Purkett v. Elem*, 514 U.S. 765, 768, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995); *Valdez v. People*, 966 P.2d 587, 591 (Colo.1998) ("In considering the proper standard of review, we seek guidance from Title VII cases," citing *Batson* ). In *Batson*, the Supreme Court expressly relied on *Anderson v. Bessemer City* for the proposition that a finding of intentional discrimination is a finding of fact, entitled to appropriate deference by a reviewing court. 530 U.S. at 98 n. 20, 120 S.Ct. 2054. Likewise, we have found it to be "well settled that the trial court's determination in the third step of the *Batson* analysis of actual racial discrimination is an issue of fact to which we afford due deference and review only for clear error." *Valdez*, 966 P.2d at 590; *see also People v. Cerrone*, 854 P.2d 178, 191 (Colo.1993) (same).

Rather than holding that a finding of intentional discrimination is a conclusion of law, if the majority intends only that an administrative agency can decide matters of historical fact for itself, as long as they are ultimate rather than intermediate issues, its holding nevertheless contravenes prior holdings of this court that limit factfinding to bodies receiving evidence. With regard to the role of hearing officers in the process of administrative adjudication, section 24–4–105(15)(b), 7 C.R.S. (2000), distinguishes "findings of evidentiary fact," from "ultimate conclusions of fact," and permits the former

to be set aside by an agency on review only where they are "contrary to the weight of the evidence." We have consistently construed the latter conclusions, however, as including only conclusions of law or mixed questions of law and fact, which are usually phrased in the language of a controlling statute or legal standard. *See State Bd. of Med. Exam'rs v. McCroskey*, 880 P.2d 1188, 1193 (Colo.1994). Evidentiary findings of a hearing officer, by contrast, are binding on an agency in its review function as long as they are adequately supported by the record. *Blaine v. Moffat County Sch. Dist. Re No. 1*, 748 P.2d 1280, 1288 (Colo.1988). "To permit the board to make new findings of evidentiary fact would contravene the underlying statutory scheme by transferring the hearing officer's responsibility for making factual determinations, which determinations are necessarily based on an evaluation of the credibility of witnesses and often require a weighing of conflicting evidence, to an administrative board which has neither seen nor heard the testimony of the witnesses." *Id.*

To the extent that the majority treats a finding of intentional discrimination as a matter of fact, then its holding permits the board to determine a matter of historical fact without hearing or seeing the testimony of the witnesses. On the other hand, to the extent that it treats a finding of intentional discrimination as a matter of law, it radically departs from the precedent of both this court and the United States Supreme Court and upholds the Personnel Board's conclusion of law as being supported by sufficient evidence in the record, without separately deciding the matter of law de novo. Because I consider the ALJ's finding of an absence of intentional discrimination to be a finding of fact that was entitled to deference by the Board, I would uphold reversal of the Board's decision to set it aside.

Justice KOURLIS joins in the dissent and the concurrence.