**COLORADO STATE BOARD OF MEDICAL EXAMINERS,**
Petitioner–Appellee,

v.

**Sharon R. JOHNSON, M.D.,**
Respondent–Appellant.

**No. 01CA1613.**

Colorado Court of Appeals,
Div. III.

Sept. 26, 2002.

Rehearing Denied Dec. 12, 2002.

Certiorari Denied April 21, 2003.

Ken Salazar, Attorney General, Claudia Brett Goldin, Assistant Attorney General, Denver, CO, for Petitioner–Appellee.

Sherman & Howard, L.L.C., Frederick Y. Yu, Claire E. Douthit, Denver, CO, for Respondent–Appellant.

Opinion by Judge DAVIDSON.

In this appeal pursuant to §§ 12–36–119 and 24–4–106(11), C.R.S.2002, respondent, Sharon R. Johnson, M.D., seeks review of the order of the Colorado State Board of Medical Examiners (Board) denying her application for a license to practice medicine in Colorado. We affirm.

Johnson received her medical degree from the American University of the Caribbean (AUC) in Montserrat, West Indies, in 1986, but she received her medical training at other locations. She completed her first two years of coursework at the University of Missouri at Columbia and completed subsequent clinical rotations in the United States in programs approved by the Accreditation Council of Graduate Medical Education (ACGME). She also received more than three years of postgraduate training and board certification in anesthesiology.

In 1999, Johnson applied to the Board for a license to practice medicine in Colorado. Panel A, acting as a subcommittee of the Board, denied the application on the ground that Johnson had not graduated from a medical school approved pursuant to § 12–36–108, C.R.S.2001.

Johnson requested a hearing pursuant to § 24–4–104(9), C.R.S.2002. After the hearing, the ALJ's initial decision found, inter alia, that Johnson was "essentially a United States' trained medical professional" and concluded that the Board had abused its discretion and that Johnson should be granted a license.

The Board filed exceptions to the initial decision pursuant to § 24–4–105(14)(a)(II), C.R.S.2002. After reviewing the initial decision, another subcommittee of the Board, Panel B, issued its final decision. It rejected some of the ALJ's conclusions and denied Johnson's application, essentially on the ground that her training was not equivalent to that provided by an approved school.

On appeal, Johnson contends that the Board improperly substituted its findings of fact for those of the ALJ, arbitrarily and capriciously denied her application, and violated § 12–36–107.6, C.R.S.2002, and Board policies when it did so. We disagree.

■ Whether Johnson's education, including that at AUC and her postgraduate training, provided qualifications equivalent to those provided by a degree from an approved school is an ultimate conclusion of fact. Accepting the evidentiary findings of the ALJ, the Board was free to reach a different ultimate conclusion, so long as it was supported by the law and substantial evidence in the record and was not arbitrary and capricious. *See Lawley v. Dep't of Higher Educ.*, 36 P.3d 1239 (Colo.2001); *Colo. State Bd. of Med. Exam'rs v. McCroskey*, 880 P.2d 1188 (Colo. 1994).

> In determining whether an administrative agency's decision is arbitrary or capricious, the court must determine whether a reasonable person, considering all of the evidence in the record, would fairly and honestly be compelled to reach a different conclusion. If not, no abuse of discretion has occurred and the agency decision must be upheld.

*Wildwood Child & Adult Care Program, Inc. v. Colo. Dep't of Pub. Health & Env't*, 985 P.2d 654, 658 (Colo.App.1999).

We conclude that the Board properly determined that Johnson did not demonstrate that her medical school education was equivalent to that provided by an approved school. Therefore, a reasonable person would not be compelled to reach the conclusion that she was entitled to a medical license under § 12–36–107.6, and we must uphold the Board's decision.

### I.

We first address the relevant substantive and procedural aspects of the application process for a license to practice medicine in Colorado.

The Board may refuse to license an applicant if it determines that the applicant does not possess the qualifications required by the Medical Practice Act (MPA), § 12–36–101, et seq., C.R.S.2002. *See* § 12–36–116(1)(a), C.R.S.2002. An application must include "such documents, affidavits, and certificates as are necessary to establish that the applicant possesses the qualifications prescribed by [the MPA]," and the burden of proof is on the applicant. Section 12–36–111(1), C.R.S. 2002.

One qualification required under the MPA is that the applicant have graduated from "an approved medical college, as defined in section 12–36–108." Section 12–36–107(2)(b), C.R.S.2002. Section 12–36–108, in turn, defines an "approved medical college" as one that meets the educational standards of the liaison committee on medical education (LCME), that has been approved by the LCME, or that has been approved by the Board on its own investigation of the school's educational standards and facilities.

However, § 12–36–107.6(1), captioned "Foreign medical school graduates—degree equivalence," provides a limited exception for foreign medical school graduates:

> For graduates of schools other than those approved by the [LCME] ... the board may require three years of postgraduate clinical training approved by the board. An applicant whose foreign medical school is other than as defined in section 12–36–108 shall be eligible for licensure at the discretion of the board if the applicant meets all other requirements for licensure and holds specialty board certification, current at the time of application for licensure, conferred by a regular member board of the American board of medical specialties or the American osteopathic association. The factors to be considered by the board in the exercise of its discretion in determining the qualifications of such applicants shall include the following:
>
> (a) The information available to the board relating to the medical school of the applicant; and
>
> (b) The nature and length of the postgraduate training completed by the applicant.

The Board has adopted a written policy implementing the statutory provisions as they relate to graduates of foreign medical schools. Pursuant to Board Policy 20–5, applicants from foreign medical schools must complete a questionnaire regarding the school's standards and facilities:

> If the applicant's answers to the questionnaire are satisfactory and if the Board is

not in possession of any derogatory information regarding the medical school, the Board will approve the school for purposes of licensing a specific applicant pursuant to section 12–36–108. If the applicant is Board certified by an ABMS or AOA Specialty Board, approval of the school is not required to license the applicant (Reference section 12–36–107.6). If the applicant affirmatively answers all of the questions on the Board's questionnaire regarding the medical school and if there are no other issues (i.e., malpractice history, disciplinary history, etc.) which would require Board review, the application does not need to be forwarded to a Board member for special consideration.

An applicant who is denied a license without a hearing may request a hearing before the agency, conducted pursuant to § 24–4–105, C.R.S.2002. Section 24–4–104(9). However, such a hearing is not merely a review of the first panel's license denial, but instead requires that findings of fact and conclusions of law be made based on the evidence presented at the hearing. The initial decision rendered pursuant to such a hearing must include "a statement of findings and conclusions upon all the material issues of fact, law, or discretion presented by the record and the appropriate order, sanction, relief, or denial thereof." Section 24–4–105(14)(a), C.R.S. 2002.

If an appeal to the Board is made by filing exceptions to the initial decision, the Board, acting through the subcommittee that did not originally deny the license, may affirm, set aside, or modify the initial decision consistent with the facts and the law. However, the Board may not set aside the ALJ's findings of evidentiary fact, as distinguished from ultimate conclusions of fact, unless they are contrary to the weight of the evidence. *See* § 24–4–105(15)(b), C.R.S.2002; Board Policy 20–2.

 Upon review of the Board's action, this court must affirm if it finds no error. However, if the action is arbitrary and capricious, an abuse of discretion, based upon clearly erroneous findings or findings unsupported by substantial evidence, or otherwise contrary to law, this court shall set aside the action. Section 24–4–106(7), (11)(a), C.R.S. 2002. The court must view the record as a whole and in the light most favorable to the Board when determining whether the Board's decision is supported by substantial evidence. *See Lawley v. Dep't of Higher Educ., supra; Colo. State Bd. of Nursing v. Lang*, 842 P.2d 1383 (Colo.App.1992).

The Board enforces the MPA, with its attendant goals of protecting the public from the "unauthorized, unqualified, and improper practice of the healing arts in this state." Section 12–36–102, C.R.S.2002. It is comprised of members with medical degrees and has broad discretion to determine the ultimate fact of whether an applicant is qualified under the MPA. Vesting such discretion in the Board rather than the ALJ promotes uniformity in decision-making. *Cf. State Bd. of Med. Exam'rs v. McCroskey, supra.*

## II.

 Johnson first contends that information about the quality of AUC's medical program may not be considered when assessing her application. Alternatively, she contends that the Board erroneously rejected the ALJ's findings of fact regarding her experience at AUC. We disagree with both contentions.

## A.

 Johnson contends that the Board's denial of her license based on information about AUC was erroneous because the Board may rely only on the grounds set forth in its notice of denial—here, the nonapproved status of AUC—and approval of her school is unnecessary under § 12–36–107.6 and Board policy because she is board certified. We disagree.

Here, the Board's notice of denial did not address § 12–36–107.6. However, in her answer to the notice of grounds for denial, Johnson raised that section in response to the Board's allegation that AUC was not an approved school. The Board then addressed the requirements of that section at the hearing, relying, inter alia, on information it had on the alleged inadequacy of the AUC program. Because under § 24–4–105(14)(a), the

ALJ is required to make findings and conclusions on all material issues presented by the record, the ALJ's initial decision properly considered the information about AUC.

Moreover, § 12–36–107.6 requires the Board to consider the information available to it about the applicant's medical school when exercising its discretion to license board certified graduates of nonapproved medical schools. Johnson's argument to the contrary notwithstanding, the statement in Board Policy 20–5 that approval of the school is not necessary when the applicant is board certified does not indicate that the Board is not to consider information about the applicant's school, but only that the school need not meet the requirements of § 12–36–108.

Section 12–36–107.6 presumes that the applicant has not graduated from an approved medical school and permits the Board to license a board certified applicant, if it determines that the applicant's medical school and postgraduate training are equivalent to training at an approved school and render the applicant "qualified." Thus, the Board did not err in considering information about AUC in determining whether Johnson possessed the qualifications required by the MPA.

## B.

Johnson also contends that the Board impermissibly rejected the ALJ's findings of fact regarding certain investigative reports about AUC and her particular AUC experience. We disagree.

## 1.

In support of a denial of the license application, the Board introduced three reports, based on investigations of AUC made by New York, New Jersey, and California, as negative information available to the Board under § 12–36–107.6(1)(b). The ALJ made the following finding regarding the reports:

The Board possessed old reports from the states of NJ, NY and California in which those states refused to accept students in their respective clinical clerkships. However, the significance of the New York and California reports in this case [was] eradi-

cated by the fact that both of those states granted the Applicant a medical license. The ALJ concluded that the reports demonstrated only that the investigating states would not accept AUC students into their clinical clerkships, not whether they would license graduates or whether they would accept students who had attended classes at a location other than AUC. The ALJ's ultimate determination, after considering the information available to the Board regarding AUC, was that the information contained in the reports was not a sufficient basis for denying the application and that such a denial would constitute an abuse of discretion.

On review of the initial decision, the Board rejected the ALJ's conclusions and instead concluded that the three reports "provide ample evidence that the AUC ... has an inadequate medical degree program." The Board also concluded that the reports were significant despite their age because their dates corresponded with the period of Johnson's affiliation with AUC; that Johnson's licensure by New York and California did not affect the significance of the reports because the Board operates independently of other state boards and Johnson did not present evidence regarding those states' licensing laws and policies; and that the reports were not limited to the issue of whether students would be accepted into clinical programs, but also included "extensive, relevant information regarding the quality of the admissions process, the faculty, the administration, and the supervision of students such as the Applicant who completed clinical rotations in facilities other than those managed by the AUC."

Johnson characterizes the ALJ's findings regarding the reports as "evidentiary facts" that the Board may not reject unless they are contrary to the weight of the evidence. In contrast, the Board characterizes these findings as "ultimate conclusions of fact," which it may reject and replace as long as its conclusions have a reasonable basis in law. We agree, for the most part, with the Board.

Although the distinction between evidentiary facts and ultimate conclusions of fact is not always clear, evidentiary facts generally include the detailed factual or histor-

ical findings on which a legal determination rests. Ultimate conclusions of fact, on the other hand, involve conclusions of law, or at least mixed questions of law and fact, and often settle the rights and liabilities of the parties.

*Lawley v. Dep't of Higher Educ., supra,* 36 P.3d at 1245 (citation omitted).

That New York and California granted Johnson medical licenses is an historical fact. A separate finding of the ALJ reflecting Johnson's licensure in those and other states was not disturbed by the Board. However, the determination whether the significance of the New York and California reports was "eradicated" by Johnson's subsequent licensing in those states depends upon the scope of the investigations and the information contained in the written reports and thus constitutes an ultimate conclusion of fact. We also note that the ALJ made no finding that the New Jersey report was not significant.

To the extent that the dates of the reports are historical facts, the characterization of the reports as "old" includes some connotation as to the effect they should be given on consideration of Johnson's application. However, even if the Board was bound by the finding that the reports were old, such a finding is not necessarily inconsistent with a conclusion that Johnson did not possess the required qualifications. Thus, the Board was free to reach an alternative conclusion as to the content and effect of the reports, so long as the conclusion was supported by the law and the evidence.

### 2.

Regarding the quality of Johnson's particular medical school training, the ALJ found that Johnson attended the University of Missouri for the first two and one-half years of medical school and then took a leave of absence and that she studied through the AUC for the final two years. The ALJ did not make specific findings regarding the time and place of Johnson's clerkships during her affiliation with AUC, but found that: "Because (1) the Applicant attended a United States college for two of the four years of her medical college education and (2) her medical residency clerkships and medical practice

were entirely in the United States, the Applicant is essentially a United States' trained medical professional." The initial decision further stated: "The Applicant's first two years of medical college occurred in the United States. She successfully interned, clerked and worked at several United States hospitals." The ALJ ultimately determined that denying Johnson a license based on an alleged failure to possess the minimum requirements would be arbitrary and capricious.

On review, the Board rejected those portions of the decision regarding Johnson's clerkships and substituted the following:

33. The Applicant's performance during her first two years of medical school at the University of Missouri—Columbia was, in her own words, "sub-optimal" and led to a required leave of absence from which she was never reinstated.

34. The second portion of the Applicant's medical school career occurred through the AUC, which allowed her to arrange her own clinical rotation. The Applicant had no knowledge and presented no evidence regarding the nature of the AUC's supervision of her clinical rotation and the information in the possession of the Board supports the finding that the AUC did not adequately supervise or evaluate those rotations and therefore was not sufficiently accountable for the quality of Applicant's medical school education. This determination is supported by the standards of the [LCME].

The Board rejected the conclusion that Johnson was essentially a United States' trained physician and substituted the conclusion that "when the factors specified in section 12–36–107.6(1) are considered in the context of the record as a whole, the evidence clearly supports the Panel's decision to deny Applicant's application for a license."

"[A]n ALJ's finding of evidentiary fact may not be altered by the Board if supported by the evidence," but the ALJ's conclusions are not binding. *See Colo. State Bd. of Med. Exam'rs v. Hoffner,* 832 P.2d 1062, 1067 (Colo.App.1992); § 24–4–105(15)(b).

The ALJ made no specific findings whether AUC adequately supervised Johnson's clinical rotations. However, Johnson contends that the ALJ's findings that she was essentially a United States' trained physician and that she had successfully completed her medical school and postgraduate training constituted findings of evidentiary fact that are inconsistent with a finding that she was not adequately supervised. We do not agree.

The ALJ's findings that Johnson successfully completed clerkships in the United States and was essentially a United States' trained physician contain elements of both evidentiary fact and ultimate fact. That Johnson passed courses and rotations she attended in the United States and graduated from medical school are historical facts that the Board may not, and did not, reject. However, to the extent that the findings that she was "successful" in completing the training and "essentially" a United States' trained physician indicate a conclusion that the training was equivalent to that offered by an approved school in the United States, they are conclusions of ultimate fact, which the Board was free to reject.

Whether AUC's supervision was "adequate" is itself an ultimate fact, determined based on the historical facts regarding the supervision. Johnson had the burden of proving that AUC's supervision of her clinical rotations rendered her education equivalent to that of an approved school or that she had obtained equivalent training in some other manner.

Johnson's argument to the contrary notwithstanding, the Board's determination that AUC did not adequately supervise her clinical rotations is not inconsistent with the ALJ's evidentiary findings and is supported by the record. The investigative report on AUC from New Jersey indicates that, at the time of the report, AUC's "clinical clerkship program [was] poorly organized and supervised" and that its evaluation of the students was insufficient because "all evaluations are left to instructors or preceptors of individual courses and clerkships" and "there is no institutional mechanism to assess the student's progress and accomplishments." The New York report found: "The clinical clerk-

ship program is not adequately organized, administered, or supervised. There is little evidence of coordination or supervision of clerkships . . . and no information as to how students are supervised or evaluated or how the Dean monitors or evaluates the facilities in which clerkships are performed." The California report noted "concerns over the apparent absence of an acceptable core clinical training program."

While Johnson testified that AUC supervised her clerkships through grading evaluations, that the clerkships were certified by the ACGME, and that she was graded according to the same exam and performance criteria as students from the United States medical schools, she had no knowledge of the existence, or extent, of actual communication between AUC and the clinical programs regarding her performance.

### III.

In its order, the Board referred to certain events related to interpersonal problems Johnson displayed in medical school. Information about these and similar problems during her postgraduate training was contained in her license application and referenced during the hearings before the ALJ and arguments presented to Panel B of the Board. Johnson contends that the Board impermissibly relied on this evidence when assessing the qualifications provided by her medical and postgraduate training. We disagree.

Section 12–36–116, C.R.S.2002, outlines the bases on which the Board may deny a license. The stated grounds are that the applicant fails to possess the qualifications required by the MPA, has engaged in unprofessional conduct, has been disciplined in another state regarding a medical license, or has not actively practiced medicine for the two years next preceding the submission of an application for a license. The absence of interpersonal problems is not one of the qualifications specifically required by the MPA.

However, it does not follow that such problems may not be considered for any purpose. Section 12–36–107.6 states that the factors the Board should consider when assessing

the qualifications of a foreign graduate "shall include" information about the school and postgraduate training. This indicates that certain additional information may be considered by the Board when exercising its discretion, so long as it is relevant to a determination of whether the applicant's qualifications are equivalent to a degree from an approved school pursuant to § 12–36–107.6 or, pursuant to § 12–36–117, whether the applicant has engaged in unprofessional conduct.

Here, the Board cited Johnson's statement in her application explaining that the second two years of her medical education were "better because [she] had performed suboptimally once before and was determined never to do that again." The Board also noted that she was asked to take a leave of absence from the University of Missouri and failed to return.

Apparently, Johnson was asked to take a leave of absence for a period of one to three years because she was too sensitive to criticism and had issues in handling authority figures. The failure to return was attributed to the fact that, when she decided to return to medical school six years later, the University of Missouri, and all other schools to which she applied in the United States, would not admit her with advanced standing, but instead would require her to repeat the first two years.

First, we note that, because Johnson invited the Board and the ALJ to go beyond information about AUC to examine the particulars of her medical school experience, the Board's consideration of that experience did not constitute a "hidden decision agenda" that violated her right to due process. Similarly, we need not determine whether the reference in § 12–36–107.6(1)(a) to "[t]he information available to the board relating to the medical school of the applicant" would ordinarily extend beyond the school's reputation to the applicant's performance there.

In any event, the Board's order did not explicitly rely on the fact that the leave of absence may have been precipitated by interpersonal problems. While it was not made clear what Johnson meant by performing "sub-optimally," the fact that she was asked to take a leave of absence from the program would seem to fall within any definition.

Further, the Board considered the leave of absence and the failure to return, inter alia, as reflecting poorly on AUC's admissions standards, noting in its exceptions to the initial decision that: "Despite Applicant's admitted 'suboptimal' performance and required leave of absence from the University of Missouri at Columbia medical school, the AUC accepted her on her terms to enter with advanced standing status in 1984." Thus, to the extent that the Board considered the reasons for the leave of absence, it properly viewed these facts as they bore on the quality of AUC and, ultimately, Johnson's qualifications.

In questioning the quality of Johnson's postgraduate training, although it noted that Johnson had completed more than the three years of training required for consideration under § 12–36–107.6, the Board, in its exceptions to the initial decision, pointed to the fact that she had been placed on probation during a portion of her postgraduate training for recurrent interpersonal problems with other hospital personnel. However, the ALJ did not allow testimony on the interpersonal problems, and the probation during postgraduate training was not referenced in the Board's final order.

Thus, regardless of any reliance by the Board on Johnson's interpersonal problems, we conclude that there is sufficient evidence in the record to support the Board's conclusion that Johnson's medical school education and postgraduate training were not equivalent to the training received by a graduate from an approved medical school and did not render her qualified to receive a Colorado license. See Lawley v. Dep't of Higher Educ., supra (reviewing court is not limited to ALJ's findings, but must review the entire record).

Accordingly, the Board's order denying Johnson's application for a medical license is affirmed.

Judge JONES and Judge KAPELKE concur.