The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
January 11, 2018

## 2018COA2

**No. 16CA2159, Romero v. Colo. Dep't of Human Servs. — Administrative Law — State Administrative Procedure Act — Ultimate Conclusion of Fact; Constitutional Law — Fifth Amendment — Right to Remain Silent — Adverse Inference**

In this administrative law case, a division of the court of appeals considers the intersection of Colorado's State Administrative Procedure Act (APA) and application of an adverse inference to a civil defendant's invocation of his Fifth Amendment right to remain silent. As an issue of first impression, the division holds that an agency's determination in a final agency action to apply an adverse inference to a defendant's invocation of his right to remain silent is an ultimate conclusion of fact under the APA. Consequently, the agency is required, as a matter of law, to make its own determination regarding the adverse inference and can substitute its own judgment for that of the administrative law judge

regarding the inference and the weight to give the inference in light of the other evidence presented. Accordingly, a majority of the division reverses the district court's judgment because it effectively precluded the Department of Human Services from making its own determination on whether to apply the adverse inference to plaintiff, Steven Romero's invocation of his Fifth Amendment right to remain silent.

The division also considers whether the district court's decision overturning the Department's final agency action should be upheld because the Department's decision was based on insufficient evidence. A majority of the division concludes that the Department's decision was based on sufficient evidence and that the evidence was not speculative.

The dissent disagrees with the applicability of the adverse inference under the procedural and factual circumstances of this case.

The majority opinion reverses the district court's judgment and allows the final agency decision to stand.

COLORADO COURT OF APPEALS

---

Court of Appeals No. 16CA2159
City and County of Denver District Court No. 16CV31561
Honorable A. Bruce Jones, Judge

---

Steven Romero,

Plaintiff-Appellee,

v.

Colorado Department of Human Services,

Defendant-Appellant.

---

JUDGMENT REVERSED

Division VI
Opinion by CHIEF JUDGE LOEB
Nieto*, J. concurs
Davidson*, J. dissents

Announced January 11, 2018

---

Bauer & Furman, P.C., Steven M. Furman, Fort Morgan, Colorado, for Plaintiff-Appellee

Cynthia H. Coffman, Attorney General, Theodore A. B. McCombs, Assistant Attorney General, Denver, Colorado, for Defendant-Appellant

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2017.

¶ 1     In this administrative law case, the Larimer County Department of Human Services (DHS) made a finding confirming that plaintiff, Steven Romero, sexually abused his grandchildren and exposed one grandchild to an injurious environment, which required Romero to be listed in the statewide child abuse registry, known as Trails.  Romero appealed DHS's confirmations pursuant to Colorado's State Administrative Procedure Act (APA).  §§ 24-4-101 to -204, C.R.S. 2017.  An administrative law judge (ALJ) concluded in an initial decision that the preponderance of the evidence did not support DHS's confirmation decisions.  DHS appealed, and defendant, Colorado Department of Human Services (Department), reversed the ALJ's initial decision, concluding that the evidentiary facts, including an adverse inference based on Romero's invocation of his Fifth Amendment right to remain silent, supported a finding that Romero sexually abused his grandchildren.

¶ 2     Romero appealed to the district court, which reversed the Department's final decision, and the Department now appeals the

district court's judgment.[1]  Because we conclude that the

Department properly applied an adverse inference to Romero's

invocation of his Fifth Amendment rights and did not otherwise err

in its final decision, we reverse the district court's judgment.

## I.    Procedural History and Background

¶ 3    The following facts and procedural history are taken from the

administrative record in this case.

¶ 4    In 2014, L.R. (mother)[2] brought her three-year-old daughter,

K.P., to the doctor for pain and swelling around her vagina.  The

medical personnel asked mother if K.P. had been sexually abused

and ran tests for various sexually transmitted diseases, all of which

were negative.[3]  Mother asked K.P. the next day if anyone had

---

[1] The Department's appeal focuses on the application of the adverse
inference to the confirmations of sexual abuse against Romero's
grandchildren.  However, the Department's briefs make it clear that
it is also appealing the judgment as it relates to DHS's confirmation
that Romero subjected his grandson to an injurious environment by
exposing him to domestic violence.  Because we decide the merits of
the case based on the Department's authority to draw an adverse
inference, our opinion is equally applicable to both the sexual abuse
confirmations and the injurious environment confirmation.  For
brevity's sake, we focus our analysis on the sexual abuse
confirmations.
[2] Mother is Romero's adopted daughter.
[3] The swabs taken to test for Herpes were inadvertently never sent
for testing.

touched her in a "bad spot," and K.P. answered "Papa," referring to Romero. K.P. disclosed that Romero touched her "front butt" with his hand. And, in a later statement, she stated that Romero had put his fingers in her "front butt." The record also includes copies of an anatomically correct drawing where K.P. pointed to the vaginal area when asked where the "front butt" was.

¶ 5    At the time of K.P.'s disclosure, mother, K.P., and mother's older child, A.R., lived with Romero and the children's maternal grandmother, who was also Romero's common law wife (grandmother). After K.P.'s disclosure, grandmother alerted mother to Romero's potential abuse of A.R. Mother reported the potential abuse of K.P. and A.R. to the Morgan County Department of Human Services. However, Romero was the director of that office at the time, so the case was referred to DHS in Larimer County. DHS began an investigation of the alleged abuse simultaneously with a criminal investigation by law enforcement.[4]

---

[4] The record on appeal includes no information on the criminal investigation. This appeal is solely concerned with the Department's administrative, civil decision confirming the abuse and neglect allegations and subsequently listing Romero in the Trails system.

¶ 6     Both children were forensically interviewed, and A.R. was interviewed twice.  A.R. was very reluctant in his interviews, and neither interview disclosed improper contact.  However, a month later, A.R. disclosed in therapy, through words and pictures, that Romero had touched him inappropriately, focusing on an incident in a swimming pool.

### A.     DHS Decision and Romero's Listing in Trails

¶ 7     Ultimately, DHS found by a preponderance of the evidence that Romero had sexually abused K.P. and A.R.  Both of these findings, or "confirmations," were listed in Trails.

¶ 8     Romero timely appealed the confirmations to the Department's Child Abuse/Neglect Dispute Review Section.  The Department referred Romero's appeal to an ALJ.

¶ 9     As part of the discovery process for the administrative appeal, DHS deposed Romero.  Romero was represented by counsel and answered a few questions about his education and background, but he invoked his Fifth Amendment right to remain silent on the advice of his attorney for the remainder of the deposition.  The questions bore heavily on whether Romero sexually abused his grandchildren, including such direct questions as whether Romero touched K.P.

and A.R. in intimate areas and whether those touches were for Romero's sexual gratification. It is clear from the deposition transcript that Romero invoked the Fifth Amendment to protect himself in the ongoing criminal investigation into A.R.'s and K.P.'s allegations of sexual abuse.[5]

## B. ALJ Hearing and Initial Decision

¶ 10 At the hearing, the ALJ heard testimony from mother; grandmother; the medical personnel who initially treated K.P.; the children's therapist, Cassie Potts; and a clinical and forensic psychologist, Dr. Richard Spiegle. Dr. Spiegle was the only witness called by Romero; Romero did not otherwise present evidence disputing DHS's proffered evidence.

¶ 11 The forensic interviews as well as the transcript of Romero's deposition were admitted into evidence at the hearing. During closing arguments, DHS requested that the ALJ make an adverse inference regarding the questions that Romero declined to answer based on his invocation of the Fifth Amendment.

---

[5] Romero invoked the Fifth Amendment for every question, including his address, which his attorney stated could relate to where the children alleged the abuse took place.

¶ 12    The ALJ made numerous findings of evidentiary fact and reversed DHS's confirmations as to the ultimate conclusion that Romero was responsible for sexual abuse of his grandchildren.

¶ 13    Because the Department and this court must defer to the ALJ's findings of evidentiary or historical fact, we detail those findings here.

- Romero is the grandfather of K.P. and A.R.

- A.R. was living with Romero and grandmother, and Romero was A.R.'s legal guardian.

- A.R. had been suffering from encopresis[6] since sometime in 2012.

- At the time of the allegations, K.P. and mother were also living with Romero and grandmother.

- While A.R. and K.P. were living under Romero's roof, they often slept in the same bed with Romero.

---

[6] Testimony at the hearing revealed that encopresis is a kind of fecal incontinence that begins with severe, chronic constipation and can be caused by a variety of factors, including diet, emotional distress, and trauma.

- Mother took K.P. to see a pediatrician because of a bumpy rash on her inner thighs and pain and swelling in her vaginal area.

- The doctor and nurse practitioner who treated K.P. asked mother if K.P. had been sexually abused and ran tests to determine if K.P. had a sexually transmitted disease. However, no cause for the rash or swelling was ever "medically determined."

- The doctor testified that K.P. was more scared or worried by the doctor's examination of her groin than is typical for a child of her age.

- Grandmother alerted mother to Romero's potential abuse of A.R., centered on an incident in a swimming pool.

- K.P. stated that Romero touched her "front butt" and put his fingers in her "front butt," but K.P.'s forensic interview was inconclusive.

- A.R.'s first forensic interview did not disclose any inappropriate touching.

- After the first forensic interview, A.R. disclosed that Romero touched him on his butt in the pool. A.R. was

7

forensically interviewed a second time, but the ALJ determined that the second interview was tainted by leading questions.

- Both children began counseling with Potts, a therapist at Sexual Abuse Response Associates specializing in trauma. A.R. was having issues with nightmares, avoidance, shyness, sleeplessness, and difficulty focusing. Potts testified that she believed these symptoms were associated with past trauma.

- After fifteen sessions with Potts, A.R. drew a picture with stick figures of himself and Romero in a pool and described Romero touching him over his clothes. A.R. also wrote a letter to Romero that began with "why did you tuch me?" He also wrote that "in the pool grampa dad did tuched me on butt with his finger it hert." Similarly, he drew a picture of him and Romero in the pool and wrote at the bottom "tuch me in swimming pool over close."

- K.P. engaged in play therapy with Potts, and during the therapy K.P. used anatomically correct dolls in sexual positions.

- After the allegations and commencement of the investigation, Romero voluntarily relinquished his guardianship of A.R.

¶ 14   Dr. Spiegle testified that A.R.'s shyness could be attributed to encopresis. He further testified that if the encopresis was brought on by emotional turmoil, that turmoil could have derived from mother's inconsistent presence in A.R.'s life. However, Dr. Spiegle also admitted that sexual abuse could contribute to the onset of encopresis in a child.

¶ 15   The ALJ ultimately concluded that DHS "failed to establish by a preponderance of the evidence that [Romero] is a person responsible for incidents of child abuse or neglect." In making that conclusion, the ALJ emphasized the following:

- The medical examination of K.P. did not reveal the cause of the bumpy rash and pain in her genital area, although there was suspicion that they resulted from abuse.

- K.P. is very young and her forensic interview reflected her "immaturity." Her accounts were inconsistent and confusing.

- Regarding both children, there was no evidence that any contact occurred with the requisite purpose of sexual arousal, gratification, or abuse. §§ 18-3-401(4), -405, C.R.S. 2017.

- Regarding A.R., neither forensic interview revealed any inappropriate touching and his drawings were inconclusive, even with the testimony of Potts.

- Dr. Spiegle's testimony indicated that A.R.'s encopresis could have been triggered by emotional issues with mother, not Romero.

- The ALJ opined that "the evidence does not preponderate on such an important issue as is presented here."

¶ 16    In the initial decision, the ALJ made no reference to the Department's request for an adverse inference.

## C.    DHS's Appeal to the Department

¶ 17    DHS appealed the ALJ's order to the Department for a final decision. DHS argued that the ALJ erred in failing to draw an

adverse inference from Romero's invocation of his Fifth Amendment right against self-incrimination. Specifically, DHS argued that the ALJ did not consider Romero's deposition transcript because the ALJ failed to mention it in any of his findings of fact or conclusions and it was not listed as an exhibit in the ALJ's order. Romero responded that there was no credible evidence or substantive testimony to be disputed, and that, therefore, an adverse inference was not "helpful."

¶ 18    The Department accepted the ALJ's findings of evidentiary fact, but overturned the ALJ's ultimate conclusion of fact and found that DHS had proven by a preponderance of the evidence that Romero sexually abused K.P. and A.R. In doing so, the Department first concluded that the ALJ had not considered Romero's invocation of his Fifth Amendment rights. However, based on that invocation, the Department made its own determination to apply the adverse inference in its analysis. Specifically, the Department focused on the questions regarding whether Romero ever touched K.P.'s or A.R.'s private areas, and if so, whether he did that for his own sexual gratification. The Department found that the adverse inference, combined with a number of other facts supported by the

record, showed by a preponderance of evidence that Romero abused his grandchildren.

¶ 19    The Department emphasized the following evidentiary facts pertaining to Romero's sexual abuse of K.P.:

- K.P. presented as more scared during the medical exam of her groin and genitals than was typical of children her age.

- K.P. asked the medical personnel not to stick their fingers in her "front butt."

- The medical personnel strongly suspected sexual abuse as evidenced by the questions they asked mother and the tests they chose to run.

- K.P. disclosed in her forensic interview that Romero touched her "front butt."

- K.P. sometimes slept with Romero.

- Children as young as K.P. often cannot express themselves in words, but can express themselves through play. K.P. used anatomically correct dolls to show sexual situations.

- The Colorado Supreme Court has "extensive case authority holding that such statements of very young children relating to incidents of sexual abuse tend to be reliable." Here, K.P. was three years old when she was taken to the pediatrician for vaginal pain and forensically interviewed.

¶ 20 Similarly, with regard to A.R., the Department emphasized the following to support a confirmation of sexual abuse:

- A.R.'s drawings, including their written notes and labels, were clear when put into context, and they disclosed abuse.

- A.R. had a withdrawn and tearful demeanor while making the "trauma narrative" drawings.

- A.R. made the statement of "why did u tuch me?" while in trauma therapy.

- A.R. sometimes slept with Romero.

- A.R. eventually disclosed that Romero touched him over his clothes.

- Dr. Spiegle's testimony that A.R.'s encopresis could have been caused by the instability of mother in his life was

not conclusive. Moreover, Dr. Spiegle acknowledged that sexual abuse could contribute to the onset of encopresis.

### D. Romero's Appeal to the District Court

¶ 21 Romero timely appealed the Department's final decision to the district court. The district court reviewed the briefs and the record and concluded that the Department had failed "to provide an adequate explanation for why it chose to draw a negative inference" from Romero's invocation of the Fifth Amendment. The court stated that "[u]nder the circumstances of this case, a non-generic explanation by [the Department] was legally necessary. . . . [T]his Court is concerned that the privilege has been reduced to 'a hollow mockery' because [the Department] equated remaining silent with guilt."

¶ 22 The court ruled that, while the Department could substitute its own judgment for that of the ALJ with respect to ultimate conclusions of fact, the Department "based its reversal almost entirely on Romero's invocation of the Fifth Amendment. . . . As a result, the court finds that [the Department's] decision was both arbitrary and capricious and contrary to law."

14

¶ 23    The court further concluded that the ALJ was best suited to consider whether the adverse inference should be applied. Consequently, the court remanded the case to the Department with instructions to remand to the ALJ to determine whether the adverse inference should be applied, and if so, whether DHS showed by a preponderance of the evidence that Romero was responsible for the alleged abuse.

¶ 24    The Department now appeals, arguing that the district court erred by overruling the Department's final decision and by restricting the application of the adverse inference to situations where the Department provides an "adequate explanation" of why it has applied the inference. For the reasons discussed below, we conclude the Department properly applied the adverse inference to uphold DHS's confirmations, and, accordingly, we reverse the judgment of the district court.

## II.    Standard of Review

¶ 25    On appeal from a district court's review of a final agency action, this court applies the same standard of review as the district court — the standard set forth in section 24-4-106(7), C.R.S. 2017. § 24-4-106(7), (11)(e); *see also Gessler v. Grossman*, 2015 COA 62,

¶ 9 (*cert. granted* June 20, 2016).  Pursuant to section 24-4-106(7),

a reviewing body may set aside an agency's decision only when the

agency action is

> arbitrary or capricious, a denial of statutory right, contrary to constitutional right, power, privilege, or immunity, in excess of statutory jurisdiction, authority, purposes, or limitations, not in accord with the procedures or procedural limitations of this article or as otherwise required by law, an abuse or clearly unwarranted exercise of discretion, based upon findings of fact that are clearly erroneous on the whole record, unsupported by substantial evidence when the record is considered as a whole, or otherwise contrary to law . . . .

If the reviewing court finds no error, it must affirm the agency

action.  *Id.*  In applying this standard, we presume the validity and

regularity of the administrative proceedings and resolve all

reasonable doubts as to the correctness of the administrative ruling

in favor of the agency.  *Gessler*, ¶ 11.

### III.   Adverse Inference for a Party's Invocation of the Fifth Amendment in Civil Cases

¶ 26    The central issue in this case is whether the Department

correctly applied an adverse inference from Romero's invocation of

his Fifth Amendment rights to its analysis of whether the evidence

supported DHS's confirmations of sexual abuse.[7]  We conclude that it did.

## A.  Preliminary Matter

¶ 27  Before addressing the Department's arguments on the merits, we first address Romero's argument that the issue of the applicability of the adverse inference was not preserved for appellate review.  Romero argues that, because the Department filed its appeal before the case could be remanded to the ALJ for a determination of whether the adverse inference should apply, the Department "waived the right to argue the issue of a potential adverse inference here."  We disagree.

¶ 28  First, Romero cites no case law, and we have found none, that supports his hybrid preservation/waiver argument in this context.  Indeed, the law is to the contrary.  *See Benchmark/Elite, Inc. v. Simpson*, 232 P.3d 777, 778 (Colo. 2010) (reversing a remand order to an ALJ).  Second, one of the Department's primary arguments is that the district court erred in overturning the Department's adverse inference decision and remanding to the ALJ for findings on

---

[7] As noted above, the same issue applies to the confirmation of injurious environment as well.

17

the adverse inference. Third, Romero concedes in his answer brief that the ALJ's silence on the adverse inference was, in fact, a decision that the inference did not apply, thereby presenting that issue to the district court for a decision, which it made. The district court's decision was a final judgment, and the Department has a right to appeal that decision.

## B.  Applicable Law

¶ 29    This case turns on the intersection of the Department's authority under the APA and the jurisprudence concerning a party's invocation of the Fifth Amendment in the context of a civil case. We outline the relevant areas of law below.

### 1.    The Department and Trails

¶ 30    The Office of Children, Youth and Families within the Department is tasked with, among other duties, overseeing the state's Division of Child Welfare. *See* § 26-1-105(2)(a), C.R.S. 2017; § 26-20-110(1)(a), C.R.S. 2017 (A working group within the division of youth services consists of "[t]he director of the office of children, youth, and families in the division of child welfare within the [Department]. . . ."); *see also* Colorado Department of Human Services, *Management Team & Organization,*

https://perma.cc/8Q6W-CB4Z. The Department administers services to individual children and families through the county department of human services offices. § 26-1-118(1), C.R.S. 2017; *see also* Colorado Department of Human Services, *Child Welfare*, https://perma.cc/82KB-QQCJ.

¶ 31 As relevant here, county department of human services offices receive reports of known or suspected child abuse or neglect. § 19-3-307(1), C.R.S. 2017. The Department is statutorily required to train county department of human services offices in investigating these reports of child abuse or neglect and reporting confirmed incidents of child abuse or neglect to the Department. § 19-3-313.5(2)(a), (b), C.R.S. 2017. The goal of the Department's training is to "achieve consistency and standardization" in investigating reports of child abuse or neglect and reporting the confirmed cases to the Department. § 19-3-313.5(2). A "confirmed" incident means "any report made pursuant to article 3 of [title 19] that is found by a county department . . . to be supported by a preponderance of the evidence." § 19-1-103(27), C.R.S. 2017.

¶ 32 When a county department of human services office confirms a report of child abuse or neglect, information on the incident and

the person found to be responsible for the abuse is added to Trails. *See* § 19-3-313.5(3). This confirmation determination is separate and apart from any criminal investigation into the suspected abuse or neglect. The department of human services investigation and confirmation process is an agency action, civil in nature, and, accordingly, subject to the "preponderance of the evidence" standard. § 19-1-103(27).

¶ 33 A person found responsible for a confirmed report of child abuse or neglect may appeal the department of human services decision that confirmed the incident(s) of abuse or neglect. *Id.* The department of human services confirmation decision is appealed to an ALJ, and a decision by an ALJ is considered an initial decision of the Department. § 26-1-106(1)(a), C.R.S. 2017. When a party files exceptions to the ALJ's decision, as was the case here, review of the ALJ's decision proceeds in accordance with the APA, section 24-4-105(15), C.R.S. 2017.

## 2. The APA

¶ 34 Section 24-4-105(15)(a) provides that the initial decision of the ALJ should be appealed to the governing agency. Here, the case was appealed to the Office of Appeals within the Department. In

such an appeal, there is a significant difference in the agency's treatment of findings of evidentiary fact and ultimate conclusions of fact. § 24-4-105(15)(b). Findings of evidentiary or historical facts made by the ALJ "shall not be set aside by the agency on review of the initial decision unless such findings of evidentiary fact are contrary to the weight of the evidence." *Id.*

¶ 35 In contrast, an agency can substitute its own judgment for that of the ALJ on "ultimate conclusions of fact" as long as the agency's conclusions have a reasonable basis in law and are supported by substantial evidence in the record. *Lawley v. Dep't of Higher Educ.*, 36 P.3d 1239, 1245 (Colo. 2001) (citing *Lee v. State Bd. of Dental Exam'rs*, 654 P.2d 839, 844 (Colo. 1982)); *accord State Bd. of Med. Exam'rs v. McCroskey*, 880 P.2d 1188, 1193 (Colo. 1994). Indeed, it is legal error for an agency to abdicate its "responsibility to make its own ultimate conclusions of fact." *Nixon v. City & Cty. of Denver*, 2014 COA 172, ¶ 25.

¶ 36 Our supreme court has acknowledged that the line between evidentiary facts and ultimate conclusions of fact is not always clear. *Lawley*, 36 P.3d at 1245; *see Nixon*, ¶ 20. "[E]videntiary facts generally include the detailed factual or historical findings on

21

which a legal determination rests." *Lawley*, 36 P.3d at 1245.

Alternatively, ultimate conclusions of fact typically involve "a conclusion of law, or at least a mixed question of law and fact," and often "settle[] the rights and liabilities of the parties." *Ritzert v. Bd. of Educ. of Acad. Sch. Dist. No. 20*, 2015 CO 66, ¶ 30 (quoting *McCroskey*, 880 P.2d at 1193); *see also Lawley*, 36 P.3d at 1245.

### 3. Adverse Inference in Civil Cases

¶ 37 It is error in a criminal case to draw an adverse inference of guilt from an accused's refusal to testify about facts relevant to his or her case. *E.g.*, *Griffin v. California*, 380 U.S. 609, 613-14 (1965); *Fitzgerald v. People*, 2017 CO 26, ¶¶ 17-18. However, that is not the rule in cases of a civil nature. Although a party in a civil case has a Fifth Amendment right to refuse to answer questions that might incriminate him or her in a future criminal proceeding, "the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them." *Asplin v. Mueller*, 687 P.2d 1329, 1331-32 (Colo. App. 1984) (quoting *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976)). This inference is equally applicable to a party who claims the Fifth Amendment privilege in response to properly

22

posed discovery questions, as Romero did here. *Chaffin, Inc. v. Wallain*, 689 P.2d 684, 689 (Colo. App. 1984). Moreover, the adverse inference has been extended to cases involving administrative agencies. *Commodity Futures Trading Comm'n v. Collins*, 997 F.2d 1230, 1234 (7th Cir. 1993) ("No law forbids a regulatory agency to draw the logical inference from a regulated entity's refusing on Fifth Amendment grounds to play ball with the agency." (citing *Baxter*, 425 U.S. at 318)).

¶ 38    The adverse inference rule is defined as follows: "Failure of a party . . . to answer questions based on the privilege against self-incrimination raises a strong inference that the answers would have been unfavorable and damaging to him, and comment to that effect is proper." *Asplin*, 687 P.2d at 1332. Whether to apply this inference is discretionary and is not mandatory. *Chaffin, Inc.*, 689 P.2d at 689 ("[T]he finder of fact in a civil case should be *permitted* to draw an adverse inference against a party who claims the Fifth Amendment privilege . . . .") (emphasis added).[8]  However, although

---

[8] Finders of fact — juries, courts, and ALJs — make both findings of evidentiary or historical fact and ultimate conclusions of fact, such as guilt or innocence, liability or nonliability, reasonable or unreasonable, etc. Stating that a fact finder should be permitted to

the fact finder may draw the adverse inference, a penalty cannot automatically be imposed solely because the accused remained silent and exercised his or her Fifth Amendment rights. *E.g.*, *Lefkowitz v. Cunningham*, 431 U.S. 801, 806-07 (1977).

## C. Analysis

### 1. The Fifth Amendment Adverse Inference is an Ultimate Conclusion of Fact

¶ 39 We first conclude that whether to apply the Fifth Amendment adverse inference in a civil proceeding and what weight to give that adverse inference in the agency's determination is an ultimate conclusion of fact. In its final decision, the Department was, therefore, *required* to make a determination of whether to apply the adverse inference, *see Nixon*, ¶ 25, and state what weight it held, if any, in its determination of whether the incidents of abuse and neglect against K.P. and A.R. should be confirmed as to Romero.

¶ 40 In order to apply an adverse inference for invocation of the constitutional right against self-incrimination, at least two factual events must have happened: (1) a party in a civil case must have

---

draw the Fifth Amendment adverse inference does not necessarily imply that the adverse inference is a finding of historical or evidentiary fact. *See, e.g.*, *Chaffin, Inc. v. Wallain*, 689 P.2d 684, 687 (Colo. App. 1994).

24

been asked questions to which his or her answers would have been potentially incriminating in a future criminal action and (2) the party must have invoked his or her Fifth Amendment rights. *Asplin*, 687 P.2d at 1331-32. It is undisputed that during the discovery phase for the ALJ hearing, DHS conducted a deposition with Romero and asked him pointed and incriminating questions, including whether he touched K.P. and A.R. for his own sexual gratification. It is also undisputed that Romero explicitly invoked his Fifth Amendment rights for the entirety of the deposition except for the first few questions. The record is clear that had Romero been called to testify at the ALJ hearing, he would have invoked his Fifth Amendment rights and refused to answer questions because of the ongoing criminal investigation into K.P.'s and A.R.'s allegations.

¶ 41 But, for the inference to apply, there must also have been probative evidence offered against the person claiming the privilege. *Id.* at 1332 (citing *Baxter*, 425 U.S. at 318); *cf. Olin Corp. v. Castells*, 428 A.2d 319, 321-22 (Conn. 1980) (listing the other evidence presented against the defendant in the trial court and affirming the trial court's order relying on a Fifth Amendment adverse inference against the defendant). "Probative evidence" means "[e]vidence that

25

tends to prove or disprove a point in issue." Black's Law Dictionary 677 (10th ed. 2014).

¶ 42 Thus, in applying the adverse inference, the fact finder must first conclude that two historical facts were present: asking potentially incriminating questions of a party and that party's invocation of the Fifth Amendment protections. The fact finder must then take those historical facts in the context of the other evidence presented and determine that the party refused to answer the potentially incriminating questions in the face of probative evidence against him.

¶ 43 Finally, if all three of these elements are present, the court or agency can choose whether to apply the inference. *Chaffin, Inc.,* 689 P.2d at 689. If the fact finder determines that the adverse inference should be applied, it then must be careful to ensure that other facts besides the adverse inference support a penalty being imposed on the party in order to avoid the evil of penalizing a person solely based on his or her assertion of a constitutional privilege. *See Lefkowitz,* 431 U.S. at 807 ("Section 22 confronted appellee with grave consequences *solely* because he refused to waive immunity from prosecution and give self-incriminating

testimony. Section 22 is therefore constitutionally indistinguishable from the coercive provisions we struck down in [previous cases] . . . .") (emphasis added).

¶ 44     In our view, this multi-step approach to determining whether and how to apply the adverse inference makes the inference an ultimate conclusion of fact because it applies the legal principles of an adverse inference and constitutional rights to evidentiary facts. *See McCroskey*, 880 P.2d at 1194 (stating that when an administrative body applies legal principles to the evidentiary facts it is an indication of an ultimate conclusion of fact). As relevant here, the Department used the Fifth Amendment adverse inference jurisprudence to determine if the historical facts of Romero's refusal to answer pointed and incriminating deposition questions based on his Fifth Amendment privileges triggered the inference; this is a classic application of a legal standard to historical facts. *Id.*

¶ 45     The Department also was required to determine that there was "probative evidence" offered against Romero in the face of his invocation. Although the Department did not explicitly state that it was making this determination in its final decision, the record shows that this part of the analysis was satisfied by the

27

Department's meticulous listing and consideration of "other corroborating evidence" that supported confirming the abuse allegations against Romero. Again, this type of analysis involves applying a legal principle — probative evidence — to the evidentiary facts found by the ALJ. *Id.*

¶ 46 We reject Romero's argument that there was no probative evidence offered against him, and thus the adverse inference should not apply. This argument is clearly belied by the record. DHS offered numerous kinds of evidence in support of the sexual abuse allegations made by K.P. and A.R., which included, but were not limited to, the children's own statements, testimony by the children's therapist, A.R.'s drawings and letters, and evidence from the medical professionals who examined K.P. (including their inquiries to mother about whether K.P. had been sexually assaulted and the numerous tests for sexually transmitted diseases). This evidence tended to show abuse occurred and was, therefore, probative. The fact that Romero disputes the weight and sufficiency of the evidence does not negate the fact that probative evidence of sexual abuse was proffered at the hearing. *See People in Interest of A.J.L.*, 243 P.3d 244, 250 (Colo. 2010) (Weighing the evidence

presented and whether evidence is sufficient and probative are separate analyses: "while a trial court may properly attach more weight to . . . evidence, whether it should do so is necessarily determined by . . . its analysis of the sufficiency and probative value of the evidence presented at trial.") (citation omitted); Black's Law Dictionary 677 (10th ed. 2014) (defining "probative evidence").

¶ 47    Moreover, the determination of whether to apply the adverse inference directly implicated Romero's constitutional rights. Whether a decision determines a party's rights or liabilities is another indication that the decision is an ultimate conclusion of fact. *E.g.*, *McCroskey*, 880 P.2d at 1193. The Department methodically discussed the evidentiary facts found by the ALJ that supported confirming the allegations. This supporting and corroborative evidence ensured that Romero's invocation of his Fifth Amendment rights did not automatically subject him to the penalties of the confirmations of abuse and subsequent listing in the Trails system. *See Lefkowitz*, 431 U.S. at 807. This type of balancing act between applying a legal principle and protecting a party's constitutional rights further indicates that the adverse

inference here can determine a party's scope of rights and is, therefore, an ultimate conclusion of fact.

### 2. The District Court Erred in Overturning the Department's Final Decision and Remanding to the ALJ

¶ 48    Next, we consider the Department's argument that the district court erred by effectively precluding it from making its own determination regarding the application of the adverse inference by holding that the ALJ was best suited to make such a determination. We conclude that the district court erred because its decision did not properly apply the pertinent statutory standard of review.

¶ 49    The district court could only overturn the Department's ultimate conclusion of fact regarding the application of the adverse inference if it was an abuse of discretion, arbitrary or capricious, or contrary to law. § 24-4-106(7); *Gessler*, ¶ 9. Here, the district court found that the Department's final order was arbitrary and capricious because the Department did not offer a "non-generic explanation" as to why it was imposing the adverse inference and because the Department reversed the ALJ "almost entirely on Romero's invocation of the Fifth Amendment." The court further concluded that the ALJ was "best suited to consider the [adverse

30

inference] issue and determine its applicability." As a result, the district court instructed the Department to remand the case to the ALJ to "determine whether, given the potential adverse inference, [DHS] has shown by a preponderance of the evidence that Romero is a person responsible for the alleged abuse." In our view, the court's analysis misapplied the APA and the applicable law on the Fifth Amendment adverse inference.

¶ 50 As we have concluded above, whether to apply the adverse inference is an ultimate conclusion of fact. Thus, as a matter of law, the Department was *required* to determine whether to apply the adverse inference and could substitute its judgment on that issue for that of the ALJ. *Nixon*, ¶ 25. Thus, the ALJ was not in the best position to make the adverse inference determination because the Department could substitute its own judgment for the ALJ's on ultimate conclusions of fact. § 24-4-105(15)(b); *Lawley*, 36 P.3d at 1245.

¶ 51 Based on our review of the Department's final decision, we conclude that it was not arbitrary and capricious, contrary to constitutional rights, or otherwise contrary to law. § 24-4-106(7). The Department's final decision was not arbitrary and capricious

31

because it was supported by the record; it took into consideration Romero's constitutional rights; and it was not contrary to the law on the Fifth Amendment adverse inference.

¶ 52　　We are not persuaded by the district court's reasoning to the contrary.  The district court deemed the Department's application of the adverse inference arbitrary and capricious because it did not provide a "non-generic explanation" for *why* it was applying the inference.  We have found no authority that supports the district court's imposition of such a duty on the Department.  None of the jurisprudence on the adverse inference requires an explanation as to why the fact finder chose to consider it.  More importantly, as discussed below, the Department's thorough discussion of the record itself shows why the Department decided to apply the adverse inference in this case.

¶ 53　　The district court expressed a concern that the Department confirmed the allegations of abuse "almost entirely" based on Romero's invocation of his Fifth Amendment rights and therefore made a "hollow mockery"[9] of Romero's constitutional rights.  We

---

[9] The phrase "a hollow mockery" appears in *Garrity v. New Jersey*, 385 U.S. 493, 499-500 (1967), and refers to the fact that one's

32

take this to mean that the district court was concerned that, as in *Lefkowitz*, Romero's invocation of his constitutional rights led to the automatic imposition of a penalty. This concern is not borne out by the Department's final decision.

¶ 54    In the first part of the Department's analysis, it concluded that it could apply the adverse inference to the incriminating questions Romero was asked in his deposition. The Department specifically referenced the questions where Romero was asked if he touched K.P.'s and A.R.'s private areas for his own sexual gratification in order to nullify the concern in the ALJ's initial decision regarding proof of the requisite purpose of sexual assault as defined in section 18-3-405. Importantly, the Department did not stop its analysis there, but proceeded to detail "other corroborating evidence to support a reasonable basis in the law pertaining to [Romero's] sexual abuse of K.P.," and it did the same regarding A.R.

¶ 55    The Department's analysis of other corroborating evidence for each confirmation was thorough and detailed. The Department enumerated the findings of historical fact made by the ALJ that

exercise of Fifth Amendment rights cannot be taken as an admission of guilt or a conclusive presumption of perjury.

33

supported the ultimate conclusion that the abuse allegations against Romero should be confirmed.  These findings included specific instances in which the Department disagreed with the ALJ's interpretation of the facts (not the facts themselves, but whether they supported the confirmations against Romero as found by DHS).  Thus, the record shows that the Department did not reverse the ALJ solely based on Romero's invocation of the Fifth Amendment.  Indeed, the Department's conclusion regarding the confirmations of sexual abuse explicitly shows that the adverse inference was applied in context with all the other findings of historical fact found by the ALJ:

> [T]he admitted exhibits as well as the undisputed testimony of the witnesses compel an ultimate conclusion, by a preponderance of the evidence, that the abuse took place *and* that [Romero's] refusal to testify resulted in nearly all of the substantive testimony being undisputed.  *Additionally,* the [Department] considers the questions asked of [Romero] during the deposition regarding sexually touching A.R. in the swimming pool . . . as well as [Romero's] invocation of the Fifth and the negative inference that [Romero's] answers would be unfavorable and damaging to [Romero].

(Emphasis added.)

¶ 56    Moreover, the Department's detailed findings and conclusions also show that the penalty here — the confirmations of abuse and their listing in Trails — was not imposed automatically simply because Romero exercised his constitutional rights.

¶ 57    In sum, we conclude that the Department's application of the adverse inference was not an abuse of discretion, arbitrary or capricious, or contrary to law or Romero's constitutional rights. Thus, we further conclude that the district court erred by effectively precluding the Department from making its own ultimate conclusion regarding the adverse inference.

### IV.   Romero's Sufficiency of the Evidence Argument

¶ 58    In his answer brief, Romero argues that the district court's judgment should be upheld because the "facts" relied on by DHS to support findings of sexual abuse are nothing more than supposition and speculation and that none of the "facts" support such ultimate findings.  We disagree.

¶ 59    Whether the administrative record contains substantial evidence to support an agency's final decision is a question of law we review de novo.  *Rags Over the Ark. River, Inc. v. Colo. Parks & Wildlife Bd.*, 2015 COA 11M, ¶ 55.

¶ 60    We defer to an agency's decision involving factual and evidentiary matters within an agency's specialized or technical expertise. *Id.* Here, the Department has specialized expertise in investigating and confirming allegations of child abuse and neglect and is charged with training department of human services offices in how to investigate such allegations and when and how to confirm and report them to the Department. § 19-3-313.5(2)(a), (b).

¶ 61    The APA provides that the Department was required to accept the ALJ's findings of evidentiary facts, but it was also equally required to make its own ultimate conclusions as to whether the evidentiary facts supported the confirmations that Romero abused and neglected K.P. and A.R. § 24-4-105(15)(b); *Lawley*, 36 P.3d at 1245.

¶ 62    Here, the Department thoroughly reviewed the facts found by the ALJ, explained instances where it disagreed with the ALJ's view as to the weight of the evidence, and, where appropriate, supported its conclusions with pertinent Colorado case law.

¶ 63    Based on its review of the record, the Department concluded that the exhibits and uncontradicted testimony showed by a preponderance of the evidence that the abuse as to both children

36

took place. It further concluded that Romero's refusal to testify "resulted in nearly all of the substantive testimony being undisputed." We perceive no abuse of discretion in these conclusions and, moreover, we defer to an agency's specialized or technical expertise. *Rags Over the Ark. River, Inc.*, ¶ 55.

¶ 64 The Department outlined its disagreement with the ALJ's conclusions in the following areas. First, as to K.P.'s disclosures and play therapy, the Department relied on its expertise to disagree with the ALJ's conclusions that K.P.'s disclosures were confusing and that her placement of anatomically correct dolls in sexual positions was inconclusive. The Department reasoned that

> the Colorado Supreme court has referred to the extensive case authority holding that such statements of very young children relating [to] incidents of sexual abuse tend to be reliable. In [a supreme court case], the child was three years old at the time she made disclosures regarding sexual abuse. In the present case, K.P. was three years old when she made disclosures of sexual abuse. Therefore the [Department] takes into account that K.P. was a very young child at the time of her forensic interview in August 2014 and that the statements of very young children tend to be reliable (despite some inconsistencies). Additionally, regarding play therapy, Ms. Potts . . . testified that '[c]hildren, especially K.P.'s age, are not able to adequately express

37

themselves verbally. They express themselves through play.' This may well explain some of K.P.'s accounts or difficulty expressing herself during her forensic interview.

¶ 65 Second, the Department found it significant that the medical personnel attending K.P. immediately asked about sexual abuse and ran tests for sexually transmitted diseases. The conclusion the Department drew from this evidence was that medical personnel believed K.P.'s rash and swelling were caused by sexual acts, contrary to the ALJ's focus that the medical personnel did not conclusively determine the cause for the rash and swelling.

¶ 66 Third, the Department found A.R.'s drawings and writings significant as to his claims of abuse, specifically noting the stage in therapy when A.R. completed those exhibits. In contrast to the ALJ, the Department concluded that the context the children's therapist provided was valuable because the evidence showed that the drawings and letters were completed when A.R. was asked about trauma in his life and "expressing that trauma."

¶ 67 Fourth, as to Romero's only witness, Dr. Spiegle, the Department found that his testimony was inconclusive and was presented at the ALJ hearing only as a "strong hypothesis."

Moreover, Dr. Spiegle conceded that sexual abuse could contribute to the onset of encopresis. In contrast, the ALJ focused on Dr. Spiegle's hypothesis that A.R.'s encopresis was caused by abandonment issues resulting from mother's behavior.

¶ 68    Lastly, in drawing the adverse inference from Romero's invocation of his Fifth Amendment rights, the Department specifically drew attention to the deposition questions regarding whether Romero touched his grandchildren for sexual gratification, and it concluded that "[w]ith the negative inference drawn, there is a reasonable basis in the law to establish that [Romero] sexually touched A.R. and K.P. with the requisite purpose of sexual gratification."

¶ 69    As discussed, the Department was authorized and required to make its own ultimate conclusion regarding whether the evidence supported confirmations of abuse by a preponderance of the evidence. The record shows the Department did so and explained where it departed from the ALJ's conclusions. The fact that Romero disagrees as to the weight of the evidence propounded by DHS does not render the evidence speculative or insufficient. We cannot conclude that the Department's view of the evidence, especially

39

given its technical expertise, was speculative or contrary to the weight of the evidence presented to the ALJ.

## V. Conclusion

¶ 70    The district court's judgment overturning the Department's final decision is reversed.

JUDGE NIETO concurs.

JUDGE DAVIDSON dissents.

JUDGE DAVIDSON, dissenting.

¶ 71    I recognize the general rule that the adverse inference of guilt may be drawn in civil cases, including administrative proceedings. I respectfully dissent because I disagree with its applicability here.

¶ 72    First, I question whether the adverse inference of guilt should be permitted in an administrative enforcement proceeding in which, as here, the administrative penalties are serious, the investigation is done in conjunction with law enforcement, nearly identical charges are pursued by both the agency and law enforcement, and exactly the same facts will form the basis of both the criminal prosecution and the agency proceedings, except that the latter demands a lower burden of proof.

¶ 73    Ineluctably, these circumstances create for an accused like Romero "a catch-22 between invoking a constitutional right that could result in an adverse inference and waiving a constitutional right and assisting a criminal case against [himself]." Tom Hanusik, *Averse to Adverse Inferences? Rethinking the Scope of the Fifth Amendment Protections in SEC Proceedings*, 41 Sec. Reg. & L. Rep. (BNA) 574 (Mar. 30, 2009), *reprinted at* https://perma.cc/UTR8-58KC, at 4-5 (The article suggests that

41

drawing the adverse inference in SEC enforcement proceedings is a deterrent to the exercise of a valid constitutional right; "[t]he time has come to rethink whether such a deterrent by a government agency that has concurrent jurisdiction with federal criminal prosecutors is either wise or constitutional."); *see* John M. Priester, *The Impact of Adverse Inferences in Administrative Hearings*, 22 J. Nat'l Ass'n Admin. L. Judges 139, 142 (2002) (noting when the penalty for invoking the privilege is of high consequence, it "effectively destroy[s] the privilege," and urging caution in drawing an adverse inference of guilt in administrative agency proceedings); *see also Baxter v. Palmigiano*, 425 U.S. 308, 335 (1976) (Brennan, J., concurring in part and dissenting in part) ("In a civil suit involving only private parties, no party brings to the battle the awesome powers of the government, and therefore to permit an adverse inference to be drawn from exercise of the privilege does not implicate the policy considerations underlying the privilege.  But where the government 'deliberately seeks' the answers to incriminatory questions, allowing it to benefit from the exercise of the privilege aids, indeed encourages, governmental circumvention of our adversary system.").

¶ 74    Second, I question whether the Department properly exercised its discretion to apply the adverse inference here.  As the district court noted, without the inference, the case against Romero was an evidentiary draw.  For the Department to use Romero's invocation of his constitutional privilege to refuse to answer incriminating questions to tip the scales under the circumstances here was, in my view, arbitrary and capricious.

¶ 75    Indeed, by applying the adverse inference post-hearing and for the first time on review, the Department not only penalized Romero's exercise of his constitutional right, it effectively shifted the burden of proof from the Department to Romero.  This is particularly so because implicit in its unchallenged evidentiary findings, in determining that sexual abuse against either child had not been proved by a preponderance of the evidence, the ALJ gave little or no credit to the accusatory testimony from mother or grandmother, found no medical evidence of sexual abuse, saw no evidence corroborative of abuse in either child's forensic interview, viewed A.R.'s drawings as inconclusive, and viewed K.P.'s doll play as irrelevant to the allegations here.  *Cf.* Hanusik, at 4 ("Given the extensive nature of the sanctions it can impose, the SEC ought to

43

be able to prove violations . . . without an inference that the accused must have committed a certain act if [he] refuse[s] to provide testimony about it.").

¶ 76    Third, because I view the adverse inference as more a measure to determine how much weight to give certain evidence than an "ultimate fact," even if it were otherwise appropriate to consider it under the circumstances here, I agree with the district court that "the ALJ was best suited to consider the issue and determine its applicability." *See, e.g., Colo. Dep't of Human Servs. v. Maggard*, 248 P.3d 708, 712 (Colo. 2011) (An agency "must defer to the ALJ's assessment of the credibility of the testimony and the weight to be given to the evidence."); *Ricci v. Davis*, 627 P.2d 1111, 1118 (Colo. 1981) ("Evidentiary facts are found by a hearing panel after it has taken and weighed evidence, as to both accuracy and credibility . . . .").

¶ 77    Accordingly, if an adverse inference of guilt were to be considered here at all, I would agree with the district court that the final decision of the Department should be reversed and the case remanded to the ALJ to determine the weight, if any, the adverse inference should be given, and in light of that, to determine whether

the Department has shown by a preponderance of the evidence that

Romero was responsible for the alleged sexual abuse.